# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:22-cr-0001** |
| | ) | |
| **WILFREDO RICARDO VAZQUEZ-LOPEZ,** | ) | |
| **JONATHAN FERNANDEZ MONTESINO,** | ) | |
| **ESTEBAN RAFAEL BORROME DIAZ,** | ) | |
| **SMARLING VILLIO DE LOS SANTO,** | ) | |
| **EMMANUEL RODRIGUEZ-RODRIGUEZ,** | ) | |
| **JOSE MANUEL MARTES-GONZALEZ,** | ) | |
| **GUILLERMO MORALES, JOSE TORRES** | ) | |
| **RUSSI, AND BEN CARRASQUILLO SANTOS** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

ATTORNEYS:

DELIA L. SMITH, UNITED STATES ATTORNEY
KYLE PAYNE, ASSISTANT UNITED STATES ATTORNEY
UNITED STATES ATTORNEY'S OFFICE
ST. THOMAS, U.S. VIRGIN ISLANDS
    FOR THE UNITED STATES OF AMERICA

NAMOSHA BOYKIN, ESQ.
THE BOYKIN LAW FIRM
ST. THOMAS, U.S. VIRGIN ISLANDS
    FOR DEFENDANT ESTEBAN RAFAEL BORROME DIAZ

DAVID J. CATTIE, ESQ.
THE CATTIE LAW FIRM, P.C.
ST. THOMAS, U.S. VIRGIN ISLANDS
    FOR DEFENDANT GUILLERMO MORALES

MATTHEW A. CAMPBELL, FEDERAL PUBLIC DEFENDER
MELANIE LARK TURNBULL, ASSISTANT FEDERAL DEFENDER
OFFICE OF THE FEDERAL PUBLIC DEFENDER
ST. THOMAS, U.S. VIRGIN ISLANDS
    FOR DEFENDANT BEN CARRASQUILLO SANTOS

GIOVANNI J. CANINO, ESQ.
SAN JUAN, PUERTO RICO

FOR DEFENDANT JONATHAN FERNANDEZ MONTESINO

**MICHAEL L. SHEESLEY, ESQ.**
MLSPC
ST. THOMAS, U.S. VIRGIN ISLANDS
FOR DEFENDANT SMARLING VILLIO DE LOS SANTO

**ALBERTO RIVERA RAMOS, ESQ.**
LOPEZ MULERO ESTUDIO LEGAL
CAROLINA, PUERTO RICO
FOR DEFENDANT JOSE MANUEL MARTES GONZALEZ

**DARREN JOHN-BAPTISTE, ESQ.**
ST. THOMAS, U.S. VIRGIN ISLANDS
FOR DEFENDANT JOSE MANUEL MARTES GONZALEZ

**LEONARD ALDRIDGE-KONTOS, ESQ.**
ECIJA-SBGB LAW OFFICES
SAN JUAN, PUERTO RICO
FOR DEFENDANT WILFREDO RICARDO VAZQUEZ LOPEZ

**CARL WILLIAMS, ESQ.**
SMITH WILLIAMS, PLLC
ST. THOMAS, U.S. VIRGIN ISLANDS
FOR DEFENDANT WILFREDO RICARDO VAZQUEZ LOPEZ

**CLIVE CLAUDIUS RIVERS, ESQ.**
LAW OFFICES OF CLIVE RIVERS
ST. THOMAS, U.S. VIRGIN ISLANDS
FOR DEFENDANT EMMANUEL RODRIGUEZ RODRIGUEZ

**JASON GONZALEZ-DELGADO, ESQ.**
SAN JUAN, PUERTO RICO
FOR DEFENDANT JOSE TORRES RUSSI

**YOHANA M. MANNING, ESQ.**
CHRISTIANSTED, U.S. VIRGIN ISLANDS
FOR DEFENDANT JOSE TORRES RUSSI

**MEMORANDUM OPINION**

**MOLLOY, Chief Judge.**

**BEFORE THE COURT** are the following motions:

1. Defendant Ben Carrasquillo Santos' ("Carrasquillo Santos")[1] Motion to Suppress Statements, ECF No. 174;
2. Defendant Jonathan Fernandez Montesino's ("Montesino") Motion to Suppress, ECF No. 267;
3. Defendant Guillermo Luis Morales Rosado's ("Rosado") Motion to Suppress, ECF No. 268; and
4. Defendant Esteban Rafael Borrome Diaz's ("Borrome Diaz") amended Motion to Suppress, ECF No. 282.

For the reasons stated below, the Court will deny Defendants Montesino's, Rosado's, and Carrasquillo Santos' Motion to Suppress. The Court will also grant in part and deny in part Defendant Borrome Diaz's motion to suppress.

## I. FACTUAL BACKGROUND

### A. Aerial Surveillance of the Jet Skis

At some point prior to December 11, 2021, an unidentified tipster provided information to U.S. Customs and Border Protection (CBP) agents that there would be a drug smuggling venture involving jet skis taking place in St. Thomas on December 11th. On the morning of December 11, 2021, at around 9:00 a.m., the CBP Air and Marine Operations (AMO) aircraft located four jet skis travelling east from Puerto Rico.[2] (ECF No. 1-1.) Deeming the jet skis suspicious, particularly given the earlier tip, the AMO aircraft maintained surveillance on all four jet skis as they traveled toward the west end of St. Thomas, eventually

---

[1] With regard to Defendant Carrasquillo Santos, both the Government and defense counsel have spelled his name differently in their various filings. The various iterations include: Carrasquillo Santos, Carrasquillosantos, Carrasquillo Santo, Carrasquillo-Santo, and Carrasquillosanto. *See, e.g.*, ECF Nos. 1, 60, 72, 89, 97, 119, 135, 225, 236. For the purposes of this opinion, the Court will use the name of the defendant provided in the Indictment. (ECF No. 225.)

[2] Each jet ski had one occupant—the operator of the vessel.

landing on Mermaids Chair Beach —a beach only accessible by water or via the entrance of the Botany Bay Preserve.

As the jet skis approached the beach around noon, the AMO aircraft team reported to the CBP agents on the ground that a red Jeep Wrangler with a black top appeared to be the lone vehicle in a small parking lot area above Mermaids Chair Beach. Additionally, the AMO aircraft observed two individuals on the shore waving their arms and giving hand signals to the four jet ski operators as they pulled onto the beach. Shortly thereafter, the AMO aircraft team also noticed two more individuals who appeared from the tree line carrying what appeared to be duffel bags. In addition, the aircraft spotted one other person next to a staircase near where the second pair of individuals had retrieved the duffel bags. According to the AMO aircraft team and the video record of the events, no one else was present on Mermaids Chair Beach the morning of December 11, 2021.

The AMO aircraft unit continued to watch as the individuals on the beach proceeded to load the duffel bags on the four jet skis. In a matter of minutes, all the duffel bags had been loaded up, and the jet ski operators quickly departed from Mermaids Chair Beach heading in the direction of Culebra, Puerto Rico.[3] The five remaining individuals also left the beach and retreated into the tree line almost immediately after the exchange had been completed. The Government asserts that the five individuals from the beach subsequently proceeded to "return" to the red Jeep Wrangler; however, no CBP agent ever witnessed the five individuals get in or out of the Jeep that morning.

**B.  The Stop of the Red Jeep Wrangler**

While the unidentified individuals loaded the duffel bags on the jet skis, CBP agents on the ground began positioning themselves at the gated community entrance of the Botany Bay Preserve in order to conduct a "felony stop" on the red Jeep. The agents chose the Botany Bay entrance as it is the only way a vehicle can return to the main public road from the Mermaids Chair Beach parking lot.

---

[3] The transfer of the duffel bags to the jet skis took no more than five minutes from the time the jet skis arrived on the beach.

Approximately twenty minutes after the AMO aircraft team notified the CBP agents at the Botany Bay gate that the four jet ski operators had departed from Mermaids Chair Beach with the duffel bags, the red Jeep Wrangler approached the gated area. With their guns pointed and the exit blocked by two law enforcement vehicles, the three federal agents ordered the occupants of the Jeep to stop and exit the vehicle.[4] The driver stopped the Jeep, and then all six occupants inside the vehicle stepped out one by one. The CBP agents immediately ordered the six individuals onto the ground, handcuffed them, and identified each of the occupants as follows: Wilfredo Ricardo Vazquez Lopez, Jonathan Fernandez Montesino, Esteban Rafael Borrome Diaz (Driver), Smarling Villio De Los Santo, Emmanuel Rodriguez Rodriguez, and Guillermo Morales Rosado.

While the occupants exited the vehicle, one of the agents instantly spotted a firearm partially inside the rear seatback pocket of the driver's seat. The gun was seized by another agent moments later while the suspects were being detained. The agents also noticed that there was a wet towel laid across the backseat, the front passenger floorboard was damp and sandy, and multiple defendants had wet sandy feet.

After the agents located the first gun, they proceeded to conduct a full search of the vehicle for potential evidence of drug trafficking.[5] Although the agents did not locate any drugs during their search, they did recover a second firearm with an obliterated serial number from inside the center console. The agents also found a vehicle pass on the rearview mirror with the name "Estaban," two key fobs in the center console that accessed the Botany Bay community gated entrance, and a rental contract indicating that one of the suspects, Emmanuel Rodriguez-Rodriguez, had rented the Jeep.

At some point after the full automobile search, a member of the Virgin Islands Police Department (VIPD) canine unit arrived on the scene to conduct a drug sniff of the Jeep. The

---

[4] One agent positioned his vehicle along the passenger side of the Jeep. The agent driving the other vehicle turned on his blue law enforcement lights and positioned his vehicle directly in front of the Jeep.

[5] While the parties were unable to precisely identify when the search of the Jeep occurred, the video recording of the events indicate that this search took place approximately fifteen to twenty minutes after the initial detention of the suspects in the Jeep. In the affidavit, the agents acknowledged that the purpose of the search was not for their safety but rather for inventorying the vehicle. *See* ECF No. 1-1.

canine alerted the agents that it had detected narcotics in the Jeep; however, agents were still unable to find evidence of any drugs inside the vehicle.

The CBP agents maintain that all six Jeep occupants were merely detained rather than arrested during the more than hour-long stop. According to the Government, the Jeep occupants were formally arrested only when one of the CBP vessels in pursuit of the jet skis confirmed that a duffel bag seized near one of the jet skis contained cocaine.

## C. The Apprehension of the Jet Ski Operators

Returning now to the four jet ski operators, as previously mentioned, all four operators quickly departed Mermaids Chair Beach immediately after receiving the duffel bags. As the jet skis headed back west in the direction of Culebra, a St. Thomas AMO patrol vessel positioned itself to conduct an investigatory stop of the jet skis near the Sandy Bay and Savanah Island area. The St. Thomas AMO also called in assistance for an AMO vessel from Fajardo, Puerto Rico. When the St. Thomas AMO vessel attempted to conduct the intended investigatory stop, all four jet ski operators ignored the St. Thomas AMO vessel's lights, sirens, and warning shots, and instead, allegedly accelerated their vessels as they continued in the direction of Culebra.  A short time later, the Fajardo AMO joined the pursuit of the jet skis. At that point, the jet ski operators split off in different directions. The Fajardo AMO vessel located two of the four jet skis—one red and one yellow. After initially falling off his jet ski, the red jet ski operator was able to regain command of his watercraft and ultimately escaped pursuit.[6] The driver of the yellow jet ski drove the jet ski onto a beach near the north side of Culebra. The agents on the Fajardo AMO vessel pursued the driver of the yellow jet ski, but he escaped on foot. However, during the pursuit, the Fajardo agents

---

[6] While not particularly relevant for the purposes of the motions at issue here, on December 21, 2021, CBP AMO agents located the red jet ski abandoned in Culebra close to where the agents saw the vessel during the December 11th chase. (ECF No. 198.) The agents determined that it was registered to Defendant Jose Torres-Russi. *Id.* The registration documents also included a photo of Russi. *Id.* Once the agents confirmed that Russi appeared to be the same man who was operating the red jet ski on December 11, 2021, the CBP agents charged Russi in this case. *Id.* Defendant Russi does not raise any challenges to the search or seizure of any evidence in this case.

located a red duffel bag near the yellow jet ski which contained a substance that yielded positive results for the presence of cocaine.[7]

While the Fajardo AMO vessel pursued the operators of the red and yellow jet skis, the St. Thomas AMO vessel pursued the driver of the silver jet ski who they eventually apprehended and arrested near a bridge in Culebra. The driver was identified as Jose Manuel Martes Gonzalez.

A short while later, the Puerto Rico Police Joint Forces for Rapid Action (FURA) marine unit notified the Fajardo AMO team that a black jet ski was seen being loaded onto a trailer at the Las Croabas boat ramp. According to the FURA team, the individuals loading the jet ski appeared to be in a "rush." Following up on this notice, Supervisory Agent Melvin Garcia ("Agent Garcia") and Agent Jeff Schneeberger ("Agent Schneeberger") of the Fajardo CBP/AMO team responded to the Las Croabas boat ramp area where they eventually located an individual whom Garcia had reason to believe was the owner and driver of the black jet ski. The CBP agents later identified the individual as Ben Carrasquillo Santos ("Carasquillo Santos").

When Agent Garcia and Agent Schneeberger approached Carrasquillo Santos on the boat ramp, he was already speaking to two FURA officers. Agent Garcia interrupted the conversation to conduct, what he referred to as, a "documents check boarding process." During this "check" Garcia questioned Carrasquillo Santos about his past jet ski trips. Specifically, Garcia asked where Carrasquillo Santos was coming from and what was the purpose of his most recent trip. Carrasquillo Santos stated that he was driving jet skis with a group of friends but was somewhat unclear about where he went and where he had come from.[8] He eventually admitted that he had recently traveled to Culebra, Puerto Rico.

---

[7] Once the duffel bag was seized, the Fajardo AMO notified the CBP agents who had detained the individuals in the red Jeep Wrangler that there was cocaine in one of the duffel bags. It was at this point that the CBP agents formally arrested the six occupants of the Jeep. *See* ECF No. 292 at 4.

[8] According to Agent Garcia, Carrasquillo Santos stated "he was traveling with a group of friends with jet skis and that he had returned." The Court presumes that since the FURA agents saw Carrasquillo Santos pull into the Las Croabas boat ramp, what Carrasquillo Santos meant by "returned" is that he left from the Las Croabas boat ramp, and then returned to that boat ramp at the conclusion of his trip that day.

However, still unsatisfied with Carrasquillo Santos' answers, Agent Garcia continued asking Carrasquillo Santos where he was coming from and if he had traveled to St. Thomas during his most recent trip. Carrasquillo Santos allegedly hesitated at this line of questioning, but he eventually stated that he may have gone halfway between St. Thomas and Culebra during his trip that day.

At some point during the interview, Agent Schneeberger told Agent Garcia to look at the message on his phone. The message contained a photo taken by the AMO aircraft team of an individual on a black jet ski headed toward St. Thomas earlier that morning.[9] According to Agent Garcia, both Carrasquillo Santos' clothes and jet ski appeared to be identical to the clothes and jet ski in the photo on Agent Garcia's phone. While Agent Garcia was looking at the photo, Carrasquillo Santos allegedly looked over at Agent Garcia's phone and spontaneously said, "[y]es that's me. But that was in Culebra. I never, I wasn't in St. Thomas." Shortly thereafter, Carrasquillo Santos made his statement, CBP agents arrested him and took him into custody.

On December 13, 2021, the Government filed a Complaint against Ben Carrasquillo Santos, Esteban Rafael Borrome Diaz, Jonathan Fernandez Montesino, Jose Manuel Mates Gonzalez, Smarling Villio De Los Santo, Guillermo Morales, Wilfredo Ricardo Vazquez Lopez, and Emmanuel Rodriguez. The Complaint alleged that each of the nine individuals engaged in a conspiracy to possess with intent to distribute a controlled substance.

The Government then filed an Information on January 12, 2022, adding an additional count against all nine defendants for possession with intent to distribute cocaine. (ECF No. 72.). Then, on October 6, 2022, the Government filed an Indictment charging all nine defendants with one more additional charge of possession of a firearm in furtherance of a drug trafficking crime. Thus, in total, the defendants were charged by Indictment with: (1) conspiracy to possess with intent to distribute cocaine; (2) possession with intent to distribute cocaine; and (3) possession of a firearm in furtherance of a drug trafficking crime.

---

[9] According to Agent Garcia, the outfit Carrasquillo Santos was wearing at the time was identical to the outfit the man on the jet ski in the photograph was wearing. The jet ski on the ramp and the jet ski in the photo also appeared to be the same.

Since this case began, the defendants have filed several motions seeking to suppress evidence. Ben Carrasquillo Santos filed a motion to suppress the statements he made to Agent Garcia at the Las Croabas boat ramp on April 14, 2022. (ECF Nos. 174.)[10] On November 14, 2022, Johnathan Fernandez Montesino filed a motion to suppress the evidence of the two firearms seized from the Jeep to which all his codefendants in the Jeep Wrangler joined except for Morales. (ECF No. 267.)[11] On November 14, 2022, Guillermo Morales filed his own motion to suppress the two firearms and any other evidence seized from the red Jeep Wrangler on December 11, 2021, to which all the Jeep defendants joined. (ECF No. 268.)[12] That same day, Esteban Rafael Borrome Diaz also filed a motion to suppress, which he amended on November 21, 2022. (ECF Nos. 271 and 282.) Only De Los Santo, Lopez, and Rodriguez joined Borrome's motion to suppress. *See* ECF Nos. 272, 274, 280. On January 4, 2023, the Government filed a compiled opposition to the three motions to suppress evidence addressing each of the defendants' arguments, collectively. (ECF No. 292.) Morales filed a reply to the Government on January 11, 2023, to which Borrome, Lopez, and Rodriguez joined. *See* ECF Nos. 294, 295, 296, 297.  Thus, the matter being fully briefed, is now properly before the Court.

## II.  FOURTH AMENDMENT LEGAL STANDARDS

### A.  Fourth Amendment Seizures

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A person is "seized" within the meaning of the Fourth Amendment "when [an] officer, by means of [1] physical force or [2] show of authority, has in some way restrained

---

[10] The Government responded to Carrasquillo Santos' motion to suppress on April 27, 2022. (ECF No. 177.)

[11] Esteban Rafael Diaz Borrome joined on November 14, 2022. (ECF No. 271.) Smarling Villio De Los Santo and Wilfredo Ricardo Vazquez Lopez joined on November 15, 2022. (ECF Nos. 272 and 273.) And Emmanuel Rodriguez Rodriguez joined on November 16, 2022. (ECF No. 280.)

[12] Jonathan Fernandez Montesino and Esteban Rafael Diaz Borrome joined on November 14, 2022. (ECF Nos. 270 and 271.) Smarlling Villio De Los Santo and Wilfredo Ricardo Vazquez Lopez joined on November 15, 2022. (ECF Nos. 272 and 273.) And Emmanuel Rodriguez Rodriguez joined on November 16, 2022. (ECF No. 280.)

the liberty of a citizen." *California v. Hodari D.*, 499 U.S. 621, 625 (1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 19, n. 16, (1968)). While an exercise of physical force alone is sufficient to constitute a seizure under the Fourth Amendment regardless of whether the application subdues the citizen, a citizen is only seized by a showing of authority if the officer's words or conduct would convey to a reasonable person that their freedom of movement has been restricted and the person, in fact, submits to the officer's authority. *See Torres v. Madrid*, 141 S. Ct. 989, 995 (2021); *Brendlin v. California*, 551 U.S. 249, 254 (2007).

### 1. *Terry* Stops

Because the Fourth Amendment protects against unreasonable seizures, an officer must generally have a warrant to conduct a seizure. As such, "[w]arrantless . . . seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies." *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010). One of the most common exceptions to the warrant requirement "permits brief investigatory seizures commonly called '*Terry* stops.'" *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018). The Supreme Court has explained that a law enforcement officer may conduct an investigative *Terry* stop as long the "officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Additionally, the officers may conduct a frisk of a suspect and or their vehicle if the officers have a reasonable articulable suspicion that the suspect is armed and dangerous. *See Adams v. Williams*, 407 U.S. 143, 146 (1972); *Michigan v. Long*, 463 U.S. 1032, 1050 (1983).

### 2. When a *Terry* Stop Evolves into an Arrest

While the Court has noted that certain types of seizures, such as *Terry* stops, may be justified by mere reasonable suspicion, once the seizure rises to the level of a traditional arrest or its equivalent, probable cause is required. *See Kaupp v. Texas*, 538 U.S. 626, 630 (2003) (noting that where the seizure at issue was "in important respects, indistinguishable from a traditional arrest," probable cause or judicial authorization was required (quoting *Dunaway v. New York*, 442 U.S. 200, 212 (1979))).

### B.  Fourth Amendment Searches

The Fourth Amendment also prohibits unreasonable searches. U.S. Const. amend. IV. A search occurs when the government engages in a (1) "physical intrusion of a constitutionally protected area" or (2) invades an expectation of privacy that society recognizes as a reasonable expectation. *Florida v. Jardines*, 569 U.S. 1, 5 (2013) (*citing United States v. Knotts*, 460 U.S. 276, 286 (1983)); *see Kyllo v. United States*, 533 U.S. 27, 33 (2001).

When an officer's conduct satisfies either prong of the two-part inquiry, a "warrant based on probable cause" is generally required to seize evidence from that search unless a recognized exception applies. *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002); *see, e.g.*, *Horton v. California*, U.S. 496 U.S. 128, 133-34 (1990).

In the context of searches, one important exception to the warrant requirement is the automobile exception. *See Carroll v. United States*, 267 U.S. 132, 153-54 (1925) (recognizing the automobile exception for the first time). Under the automobile exception, officers may "seize and search an automobile without a warrant if 'probable cause exists to believe it contains contraband.'" *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)).[13] If there is probable cause to conduct a search pursuant to the automobile exception, law enforcement may "search every part of the vehicle and its contents that may conceal the object of the search" "including closed compartments, containers, packages, and trunks." *United States v. Ross*, 456 U.S. 798, 825 (1982); *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010). However, if a law enforcement officer conducts a warrantless search of a vehicle without probable cause, and no other exception applies, evidence obtained from that unlawful search must be suppressed as "fruits of the poisonous tree." *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (citing *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)).

### III. FOURTH AMENDMENT ANALYSIS

**A. Constitutionality of the Seizure**

    **1. Reasonable Suspicion for the Initial Stop**

---

[13] The Third Circuit in *Burton* explained that "[w]hile a seizure or search of property without a warrant ordinarily requires a showing of both probable cause and exigent circumstances, the "ready mobility" of automobiles permits their search based only on probable cause." 288 F.3d at 100.

*United States v. Borrome, et al.*
Case No. 3:22-cr-0001
Memorandum Opinion
Page 12 of 48

The defendants first contend that the initial stop of the Jeep lacked the requisite level of suspicion necessary under the Fourth Amendment. (ECF Nos. 267, 268, 282 and 294.)[14] As noted above, a person is subject to a seizure for Fourth Amendment purposes when he or she submits to an officer's "show of authority." *See Hodari D*, 499 U.S. at 625-26. In consideration of this standard, "it is settled law that a traffic stop [including a felony stop] is a seizure of everyone stopped in the vehicle." *United States v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006).[15] Thus, when an officer illegally stops an automobile, the occupants have standing to challenge the constitutionality of that seizure and may seek to suppress the fruits of that illegal seizure regardless of whether the defendant was the owner, driver, or merely a passenger. *See Mosley*, 454 F.3d at 253.

In this instance, the federal agents' initial stop of the jeep constituted, at minimum, a felony traffic stop. The agents blocked the only exit out of the property, pointed guns at the Jeep, and ordered the occupants out of the vehicle. Moreover, the agents themselves admitted their intent was to conduct a felony stop. Given the circumstances, it is almost certain that the defendants would not have felt free to drive away or "ignore the police and go about [their] business." *Wardlow*, 528 U.S. at 125 (citing *Florida v. Royer*, 460 U.S. 491, 498 (1983)). Therefore, since the defendants complied with this show of authority, the initial stop of the vehicle was a seizure under the Fourth Amendment.

While each of the defendants in the Jeep has standing to challenge the stop, their challenge is relatively constrained. Under *Terry* and its progeny, officers and agents are permitted to conduct a "brief, investigatory" stop without violating the Fourth Amendment's

---

[14] While all of the defendants argue that the requisite level of suspicion for the initial stop was probable cause, some of the defendants contend that even if the agents only needed reasonable suspicion, that standard was not satisfied here. Given that reasonable suspicion is the lower standard, the Court will begin with the reasonable suspicion analysis first. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("[T]he level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause." (citing *United States v. Montoya de Hernandez*, 473 U.S. 531 544 (1985))).

[15] *See United States v. King*, Civ. No. 420-CV-00158, 2022 WL 141553, at *13 (M.D. Pa. Jan. 14, 2022) ("Courts generally recognize that felony traffic stops—that is, traffic stops premised on suspected criminal activity as opposed to traffic violations—constitute 'seizures' that implicate the Fourth Amendment"); *United States v. McGrath*, 89 F. Supp. 2d 569, 572 (E.D. Pa. 2000) (noting that "a 'felony traffic stop' was the same as a *Terry*-stop").

prohibition against unreasonable seizures as long as the basis for the stop is supported by a *reasonable suspicion* "that criminal activity may [have] be[en] afoot."[16] *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (noting, in the context of an investigatory traffic stop, that "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion") (emphasis added); *United States v. Delfin-Colina*, 464 F.3d 392, 396-97 (3d Cir. 2006) (confirming that reasonable suspicion rather than probable cause is all that is required to conduct a *Terry* stop of a vehicle).

Although the reasonable suspicion standard requires "more than an 'inchoate and unparticularized suspicion or hunch,'" "reasonable suspicion is a generally undemanding standard" that is less than probable cause, "and falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 27); *Delfin-Colina*, 464 F.3d at 397. While officers must provide "specific articulable facts" to justify their suspicion,[17] *Delfin-Colina*, 464 F.3d at 397, the reasonable suspicion standard is still a flexible inquiry that depends on the "totality of circumstances" and "practical considerations of everyday life." *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020). Accordingly, when conducting a reasonable suspicion analysis, courts must "permit officers to make 'commonsense judgments and inferences about human behavior'" "including the modes or patterns of operation of certain kinds of lawbreakers." *Glover*, 140 S. Ct. at 188 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)); *United States v. Cortez*, 449, U.S. 411, 419 (1981); *see also United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) (emphasizing that district courts must "accord deference to an officer's judgment of whether criminal activity is taking place with an understanding that whether an officer

---

[16] Although the Supreme Court often states that an officer must have a reasonable suspicion "that criminal activity may be afoot" in order to initiate a *Terry* stop, *see, e.g.*, *Arvizu*, 534 U.S. at 273, the Court previously clarified in *Berkemer v. McCarty*, that officers may conduct an investigatory stop any time an officer reasonably suspects "a particular person has committed, is committing, or is about commit a crime[.]" 468 U.S. 420, 439 (1984). Thus, officers may conduct a *Terry* stop even if the suspected criminal activity already took place.

[17] Although the reasonable suspicion standard requires specific facts, those facts may be "less reliable than that required to show probable cause." *Alabama v. White*, 496, U.S. 325, 330 (1990).

has reasonable suspicion to warrant a stop . . . is often an imprecise judgment.") (citations omitted).

The CBP agents certainly had a reasonable suspicion to stop the red Jeep given the circumstances in this case. First, the CBP AMO aircraft team observed four jet skis coming from the direction of Puerto Rico toward the west end of St. Thomas during rough sea conditions. This conduct raised the interest of CBP agents on duty because they had received a tip that narcotics would be transported out of St. Thomas that morning by jet ski.[18] Additionally, in recent months, law enforcement had witnessed an increase in the use of jet skis by drug trafficking organizations to transport bulk quantities of drugs between the west end of St. Thomas and Puerto Rico.[19]

Even though the CBP AMO aircraft team's observation of the jet skis arrival on Mermaids Chair Beach did not necessarily create a reasonable suspicion that the nearby red Jeep was engaged in criminal activity, "officers are not required to ignore characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Wardlow*, 528 U.S. at 124 (citing *Adams v. Williams*, 407 U.S. 143, 144, 147-48 (1972)). Thus, the location of the Jeep near a drug trafficking area on a day that drug trafficking was expected to occur, and while suspicious drug trafficking activity was taking place, was at least a relevant factor in establishing the reasonable suspicion necessary to stop the vehicle.

Moreover, the agents did not rely exclusively on the red Jeep's proximity to a high crime area to conduct a stop on the vehicle. The agents' suspicion that the Jeep's occupants were involved in drug trafficking was further buttressed by the CBP AMO aircraft team's observation that the jet ski operators received duffel bags from the five lone individuals on the beach as soon as the operators arrived at Mermaids Chair Beach. The jet ski operators and the five individuals on the beach then left the area as soon as the duffel bags were loaded on the jet skis. The red Jeep subsequently pulled up to the Botany Bay Preserve gate just

---

[18] The tip was given to CBP by a confidential informant.

[19] The Court also acknowledges that the rough nature of the water the morning of December 11, 2021, made it less likely that the jet ski operators were merely driving recreationally.

moments later. The close temporal proximity between the suspicious exchange of the duffel bags, the subsequent hasty exodus of everyone on the beach, and the departure of the lone vehicle from the nearby parking lot minutes later created a commonsense inference that the five suspects on the beach were at least reasonably likely to be in the red Jeep when it reached the Botany Bay gate. *See United States v. Goodrich*, 450 F.3d 552, 562-63 (3d Cir. 2006) (finding the fact that there were no other vehicles in the area, and that the defendants were stopped "near in time and geographic proximity" to the observed criminal activity were highly relevant factors in concluding the officers had reasonable suspicion); *see also United States v. Juvenile TK*, 134 F.3d 899, 903-04 (8th Cir. 1998) (concluding that the officers had reasonable suspicion in large part because of the "temporal and geographic proximity of the car to the scene of the crime").

The defendants contend that because there was no visual confirmation that the suspicious duffel bags came from the Jeep or that the individuals on the beach got into or out of the Jeep, the only specific articulable facts the CBP agents had about the Jeep and its occupants prior to the stop was that the Jeep was parked alone in a parking lot for some time and then left. *See* ECF Nos. 294 at 3-4 and 271 at 3. Thus, the defendants essentially argue that even if the agents had reasonable suspicion that criminal activity was afoot, they did not have reasonable suspicion that the occupants of the jeep were involved in the suspected criminal activity at the time the agents stopped the vehicle.

However, because the CBP agents were given a tip, albeit a vague one, regarding alleged drug trafficking taking place on the west-end of St. Thomas, the agents did not have to know the specific identities of the individuals on the beach or in the Jeep in order to have reasonable suspicion that the Jeep and its occupants may have been involved in the suspected criminal activity.[20] Although, "an officer cannot conduct a *Terry* stop simply because criminal activity is afoot," *United States v. Brown*, 450 F.3d 552, 560 (3d Cir. 1998), courts have upheld the validity of a *Terry* stop based on a tip even where the vehicle was

---

[20] The Court in *Juvenile TK* noted that even when "there is no evidence that the police had any experience with [the] informant" in that case, that "fact alone is not dispositive where there are independent indicia of reasonable suspicion" as is the case here. 134 F.3d at 904.

doing nothing illegal at the time of the stop and there was no description of the perpetrator.[21] *See United States v. Goodrich*, 450 F.3d 552, 563 (3d Cir. 2006) (finding that "even without a detailed description of either the suspects or their vehicle, there were enough objective facts present here to provide 'reasonable suspicion' to warrant the terry stop"); *Juvenile TK*, 134 F.3d at 903; *see also Orricer v. Erickson*, 471 F.3d 1204, 1206-07 (8th Cir. 1973) (concluding that even though the detaining officer did not observe the defendant violate any law nor did he have a description of the car or persons being sought in connection with the suspected criminal activity, there was still reasonable suspicion to stop the vehicle).[22] Specifically in *Goodrich*, the Third Circuit found reasonable suspicion to sustain a detention when there was reported suspicious activity in a high crime area and the defendant's vehicle was the lone vehicle in that area prior to the stop. *See id.*[23] Therefore, as is apparent by the relevant federal court precedent, the evidence necessary to establish reasonable suspicion is relatively low.

Moreover, while the Court recognizes the fact that a Jeep parked alone near a beach in mid-day may certainly be considered innocent behavior in many circumstances, the Court in *Reid v. Georgia* explained that "there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot." 448 U.S. 438, 441 (1980) (per curium); *see also United States v. Valentine*, 232 F.3d 350, 356 (3d Cir. 2000)

---

[21] While it is certainly true "that if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable," *Alabama v. White*, 496 U.S. 325, 330 (1990), the Court is satisfied that the law enforcement collective observations provided enough additional information to reach reasonable suspicion. *See United States v. Brown*, 448 F.3d 239 (3d Cir. 2006) (noting additional circumstances that may be considered to make an otherwise insufficient tip satisfy the reasonable suspicion requirements).

[22] The *Orricer* court went on to explain that "although the suspects were last seen afoot," it was reasonable to believe that the suspects "might use a motor vehicle in which to carry their tools and to flee the scene of the crime." 471 F.2d at 1207. Additionally, given that the police only discovered two vehicles in the area during the next hour after seeing the suspects, the Court, in that case, found it reasonable to stop the vehicle near the crime scene. *See id.*

[23] While the Court in *Goodrich* did consider the lateness of the hour as a factor for establishing reasonable suspicion, *see* 450 F.3d at 561, the Court does not believe the agents' reasonable suspicion, in this case, was undermined by the fact that the suspected criminal activity took place in the morning. *See United States v. Carstarphen*, 298 Fed. App'x 151, 156 (3d Cir. 2008) ("Not every factor [in *Goodrich*] is necessary for reasonable suspicion"). *Cf. Terry*, 392 at 30 (holding that reasonable suspicion existed when the officer believed the suspects were preparing to commit a daytime robbery).

("[R]easonable suspicion does not require that the suspect's acts must always be themselves criminal."). "Even in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation." *Wardlow*, 528 U.S. at 125-26. The key is whether the circumstances, taken together, create a sufficient reasonable suspicion that criminal activity was afoot. In this instance, they do. Therefore, given the totality of factors mentioned above, the Court is satisfied that there was more than reasonable suspicion that the occupants of the vehicle had engaged in illegal narcotics trafficking just moments prior to the stop.[24] As such, the decision to conduct the initial *Terry* stop of the Jeep fell well within the strictures of the Fourth Amendment.

### 2. The Investigative Stop Did Not Amount to an Arrest

While the Court finds that there was reasonable suspicion to conduct a *Terry* stop of the Jeep, some of the defendants contend that it is irrelevant whether there was reasonable suspicion here because the initial stop was not a *Terry* stop but rather a full-blown arrest requiring probable cause.

The defendants emphasize that as soon as the red Jeep arrived at the Botany Bay gate, the Jeep was blocked and stopped by the CBP agents at gunpoint. The occupants were then ordered out of the vehicle and immediately handcuffed and placed on the ground prior to any seizure of contraband or confirmation of involvement in illegal activity. Given the combination and degree of intrusions by the CBP agents, the defendants assert that their initial seizure and detention amounted to an arrest that required probable cause as opposed to mere reasonable suspicion. Despite the defendants' assertions to the contrary, the agents' conduct was within the permissible scope of a *Terry* stop and, thus, did not transform the seizure into a de facto arrest.

---

[24] Defendants attempt to argue that because the transfer of the duffel bags on the beach to the jet skis appeared to be a one-way exchange, the suspects on the beach ceased to be engaged in any potential criminal activity once the jet skis departed from Mermaids Chair Beach with the bags. *See* ECF No. 294 at 4. Thus, Defendants contend "there was no reason for [the] agents to believe that the men in the red Jeep were still engaged in criminal acts." The defendants mischaracterize the reasonable suspicion requirements for a *Terry* stop. Officers may, of course, conduct a *Terry* stop if they reasonably believe a suspect is actively committing a crime. However, they may also initiate a stop if the officers reasonably believe a suspect "has committed or is about commit a crime. *Royer*, 460 U.S. at 498. Thus, it is of no significance in this case that the suspects involvement in the criminal activity ended upon the transfer of the duffel bags to the jet skis.

Under the Fourth Amendment, "every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause." *Leveto v. Lapina*, 258 F.3d 156, 167 (3d Cir. 2001) (quoting *Michigan v. Summers*, 452 U.S. 692, 700 (1981)). However, *Terry* stops are generally the type of "seizures significantly less intrusive than an arrest [and thus may withstand] scrutiny under the reasonableness standard embodied in the Fourth Amendment," even without probable cause. *Summers*, 452 U.S. at 697.

Although there are certainly limits, law enforcement officers are given considerable latitude to conduct their investigation while remaining within the permissible scope of a *Terry* stop.  The Supreme Court has determined that during an investigative stop, an officer may briefly effectuate a *forceable* detention in order to investigate whether "a particular person committed, is committing, or is about to commit a crime" based on mere reasonable suspicion.[25] *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *see also Florida v. Royer*, 460 U.S. 491, 498 (1983); *Adams v. Williams*, 407 U.S. 143, 146 (1972). Additionally, while conducting such a stop, officers may also take steps "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985).

Accordingly, the guiding principle is that as long as the intrusion of the affected citizen is relatively brief and reasonable in relation to the officer's reason for seizing the individual and conducting the investigation, the officer's conduct will not elevate a *Terry* stop into a traditional arrest. *Baker v. Monroe Township*, 50 F.3d 1186, 1192 (3d Cir. 1995); *see Graham v. Connor*, 490 U.S. 386, 396 (1989).[26]

With this balancing test in mind, the Third Circuit has found that "police actions in blocking a suspect's vehicle and approaching with weapons ready, and even drawn, does not

---

[25] The Court in *Berkemer* noted that this rule applies in the context of a traffic stop as well given that traffic stops are "more analogues to a so-called '*Terry* stop'… than to a formal arrest." 468 U.S. at 439.

[26] While of course, the "precedents do not categorically approve the use of forceful restraints in every investigatory stop," they do make clear that even highly intrusive conduct will not automatically constitute arrest if there are sufficient justifications for the intrusive conduct. *Patterson*, 25 F.4th at 143.

*United States v. Borrome, et al.*
Case No. 3:22-cr-0001
Memorandum Opinion
Page 19 of 48

constitute an arrest per se." *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) (collecting cases); *see United States v. Johnson*, 592 F.3d 442, 447–48 (3d Cir. 2010).[27] Along those same lines, the Third Circuit has also concluded that ordering a suspect out of a vehicle and "placing a suspect in handcuffs while securing a location or conducting an investigation" will not necessarily "transform an otherwise-valid *Terry* stop into a full-blown arrest." *United States v. Johnson*, 592 F.3d 442, 448 (3d Cir. 2010) (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995) ("There is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest."). Moreover, an "order to 'get down'" and an officer's subsequent "actions in pushing [people] down on the ground" is also permissible without probable cause under the *Terry* line of cases. *Baker*, 50 F.3d at 1192 ("Here, the need to ascertain the [citizens'] identity, the need to protect them from stray gunfire, and the need to clear the area . . . all made it reasonable to get the [citizens] on the ground for a few crucial minutes."); *see United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993) (finding that directing suspect to lie on the ground during a *Terry* stop was justified as it "provided the officers with better view of the suspect and prevented him from obtaining weapons which might have been in the car."); *Courson v. McMillian*, 939 F.2d 1479, 1495 (11th Cir. 1991).

Thus, it is axiomatic that even though precautions such as drawing weapons, handcuffing suspects, and putting the individuals on the ground during an investigation are generally recognized as the 'hallmark[s] of a formal arrest,'"[28] such protective measures,

---

[27] The other circuits have held similarly. *See, e.g., United States v. Trullo*, 809 F.2d 108, 113 (1st Cir. 1987); *United States v. Patterson*, 24 F.4th 123, 145 (2d Cir. 2022); *United States v. Bull*, 565 F.2d 869, 870 (4th Cir. 1977); *United States v. Maslanka*, 501 F.2d 208, 213 & n. 10 (5th Cir. 1974); *United States v. Lane*, 909 F.2d 895, 899 (6th Cir. 1990); *United States v. Chaidez*, 919 F.2d 1193, 1198–99 (7th Cir. 1990); *United States v. Jones*, 759 F.2d 633, 640–41 (8th Cir. 1985); *United States v. Greene*, 783 F.2d 1364, 1367–68 (9th Cir. 1986); *United States v. Merritt*, 695 F.2d 1263, 1272–74 (10th Cir. 1982); *United States v. Roper*, 702 F.2d 984, 987–88 (11th Cir. 1983); *United States v. White*, 648 F.2d 29, 34–35 (D.C. Cir. 1981).

[28] *Baker*, 50 F.3d at 1193 ("In this case, adding up the use of guns and handcuffs and, indeed, the length of the detention, shows a very substantial invasion of the [suspects] personal security."); *United States v. Alvarez*, 899 F.2d 833, 838 (9th Cir. 1990) ("if the police draw their guns it greatly increases the seriousness of the stop"); *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994) ("The Supreme Court has long allowed de minimus intrusions on the liberty of a person detained by a *Terry* stop to advance officer safety, such as a frisk for weapons or a request to step out of the car during a traffic stop. However, the use of force such as handcuffs and firearms is a far greater level of intrusion[.]") (internal citations omitted).

even if used in combination, do not automatically elevate a *Terry* stop into a de facto arrest. *United States v. Patterson*, 25 F.4th 123, 143 (2d Cir. 2022) (quoting *United States v. Bailey*, 743 F.3d 322 (2d Cir. 2014)); *see United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993) ("Clearly, using some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect—whether singly or in combination—do not automatically convert an investigatory detention into an arrest requiring probable cause."); *United States v. Taylor*, 857 F.2d 210, 213-14 (4th Cir. 1988) ("Although blockading an automobile and approaching a suspect with drawn weapons are extraordinary measures, such police procedures have been justified in this circuit as a reasonable means of neutralizing potential danger to police and innocent bystanders."). "Nonetheless, although these actions might not automatically transmute a *Terry* stop into an arrest, there must be some reason for [law enforcement] to resort to such measures." *United States v. Butler*, 93 F. Supp. 3d 392, 399 (W.D. Pa. 2015) (citing *Baker*, 50 F.3d at 1193) (explaining that the "use of guns and handcuffs must be justified by the circumstances. . .."). To determine whether such highly intrusive measures are appropriate, the relevant inquiry is whether the officer has a reasonable belief that "the individual whose suspicious behavior he is investigating . . . is armed and presently dangerous to the officer or to others," so as to justify the level of intrusion. *Terry*, 392 U.S. at 24.

When utilizing this standard, several circuits have found that a mere reasonable suspicion that a suspect is involved in drug trafficking justifies the use of weapons given the significant correlation between guns and drug trafficking.[29] *See United States v. Heath*, 259 F.3d 522, 525 (6th Cir. 2001) ("We have already found that [the suspect] was reasonably suspected of carrying drugs—the agents were, therefore, entitled to rely on their experience

---

[29] Courts have routinely acknowledged the significant connection between drug trafficking and guns. *See, e.g.*, *United States v. Russel*, 134 F.3d 171, 183 (3d Cir. 1998) ("guns are tools of the drug trade"); *United States v. Adams*, 759 F.2d 1099 (3d Cir. 1985) ("[W]eapons may be as much tools of the drug trade as the most common recognized narcotics paraphernalia."); *United States v. McCoy*, 905 F.3d 409, 419 (6th Cir. 2018) (finding that one of the "hallmarks" of gun trafficking is "gun accessories"); *United States v. Caggiano*, 899 F.2d 99, 103–04 (1st Cir. 1990) ("Guns, like glassine bags, scales and cutting equipment are an expected and usual accessory of the narcotics trade.") (abrogated on other grounds) (citations omitted); *United States v. Cruz*, 805 F.2d 1464, 1474 (11th Cir. 1986) (noting that "guns are a tool of the drug trade" and that "[t]here is a frequent and overpowering connection between the use of firearms and narcotics traffic").

and training in concluding that weapons are frequently used in drug transactions and, thus, the degree of force utilized [i.e., approaching with guns drawn] was reasonable." *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995) (finding that the officers "had every reason to believe [the suspect] was dangerous" given the reasonable belief that the suspect was "involved in a massive cocaine importation conspiracy." Therefore, "it was reasonable to have their weapons drawn upon their initial contact."); *Cf. United States v. Roper*, 702 F.2d 984 (11th Cir. 1983) (noting that even where there was no indication that the suspects "were either reportedly armed or sought to evade detention," the nature of the crime justified the officers approaching the suspects' vehicle with weapons drawn (quoting *United States v. White*, 648 F.2d 29, 56 (D.C. Cir. 1981))). Accordingly, under this line of cases, the CBP agents' act of pointing their guns at the red Jeep would certainly not elevate the defendants' initial detention to the level of a traditional arrest even considering the intrusive nature of such conduct.

As the Court has already established, in considering the totality of the circumstances in this case, the CBP agents had reasonable suspicion that the occupants of the red Jeep were involved in a large-scale drug trafficking operation the moment the agents stopped the Jeep. Consequently, there was a legitimate basis to believe that the suspects in the Jeep were armed even though they did not engage in evasive measures and there were no reports that the suspects had weapons in their possession. *See, e.g., United States v. Davis*, 726 F.3d 434, 440 (3d Cir. 2013) ("Because drug dealers often carry guns, the officer had 'a reasonable belief based on specific and articulable facts' that [suspects] were dangerous and might have weapons inside the Jeep." (quoting *Michigan v. Long*, 463 U.S. 1032, 1049 (1983)) (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002))); *United States v. Bustos-Torres*, 396 F.3d 935, 943 (8th Cir. 2005) ("Because weapons and violence are frequently associated with drug transactions, it is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction."); *United States v. Sakyi*, 160 F.3d 164, 169 (4th Cir. 1998) ("The indisputable nexus between drugs and guns presumptively creates a reasonable suspicion of danger to the officer."); *United*

*States v. Jackson*, 652, F.2d 244 (2d Cir. 1981) (finding officers had reasonable suspicion suspect was armed and dangerous based on the nature of the suspected crime).

While a reasonable suspicion that the Jeep was involved in drug trafficking might satisfy the test necessary to use highly intrusive measures in some circuits, other circuits have stated that "the naked fact that drugs are suspected will not support a per se justification for use of guns and handcuffs in a *Terry* stop" given the "far greater level of intrusion" such conduct involves. *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052-53 (10th Cir. 1994); *see, e.g.*, *United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir. 1990) (noting that while "[d]rugs and guns and violence often go together" and thus, "might be a factor tending to support an officer's claim of reasonableness," . . ."the naked fact that drugs are suspected will not support a per se justification for use of guns and handcuffs in a Terry stop."); *United States v. Ceballos*, 654 F.2d 177, 183 (2d Cir. 1981) (holding that while "narcotics traffickers are often armed and violent, that generalization, without more, is insufficient to justify the extensive intrusion which occurred in this case"—specifically the drawing of guns).[30] However, even under the more burdensome standard set out by the Second, Ninth, and Tenth Circuits, there were still sufficient additional circumstances in this case that posed a serious risk to the agents' safety, and thus, justified the agents drawing their weapons when they initiated the stop.

First, the Jeep was departing from a high crime area where CBP agents had engaged with armed drug traffickers in the past. *See United States v. Trullo*, 809 F.2d 108, 113 (1st Cir. 1987) (holding that stopping a suspect in a high crime area where the suspect was detained for suspected drug-trafficking, was a sufficient basis, alone, for the officer to draw his

---

[30] The Court believes it is important to note that in the case of *Ceballos*, the suspect was "not reputed to be a major narcotics violator." 654 F.2d at 183. Thus, given that several courts have only associated guns with large scale drug trafficking operators, the fact that the suspect in *Ceballos* was only believed to be engaged in small-time drug dealing is a noteworthy distinction from the case at bar. *See id.* (noting that the stop that was later deemed to be an arrest, was conducted based on the belief that the small paper bag in the suspect's possession contained evidence of drugs); *see also United States v. Butler*, 93 F. Supp. 3d 392 (W.D. Pa. 2015) (also finding the stop constituted an arrest where the suspect was in possession of a single "plastic shopping bag" which officers believed to contain heroin).

weapon);[31] *United States v. Laing*, 889 F.2d 281 (D.C. Cir. 1989) (noting that factors that may "escalate the use of force include . . .the 'high-crime' nature of the area."); *United States v. Lane*, 909 F.2d 895 (6th Cir. 1990) ("Similarly, although Officer Barry was not told that Lane was armed, Barry's knowledge of drug trafficking problems at the building . . . made Barry's display of his weapon 'reasonably necessary under the circumstances.'"). Additionally, when the Jeep first approached the gated entrance, the three agents on the scene had reason to believe that they were outmanned by the suspects given that the CBP AMO aircraft had identified at least five people leaving the beach just minutes earlier. *See Pollreis v. Marzolf*, 9 F.4th 737, 748 (8th Cir. 2021) (finding that a lone officer "did not use unreasonable force when he pointed his gun at the [suspects] while he waited for backup and before the situation was under control"); *United States v. Maslanka*, 501 F.2d 208, 213 n. 10 (5th Cir. 1974) (finding that a lone officer drawing his revolver while approaching three males in a car did not amount to an arrest); *Courson v. McMillian*, 939 F.2d 1479, 1483-84, 1496 (11th Cir. 1991) (noting that the officer's decision to draw his weapon was justified, in part, because the officer was outnumbered three to one). Moreover, since the suspects were still inside the vehicle at this point in the stop, "the danger was compounded" because the Jeep occupants "could not readily be prevented from accessing or using the firearm[s] then reasonably suspected to be in their possession." *Patterson*, 25 F.4th at 146; *see also Maryland v. Wilson*, 519 U.S. 408, 413-14 (1997) (noting that "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car").

Thus, the combination of factors including: the location of the suspected crime in a known drug trafficking area, the nature of the crime at issue and its high degree of association with guns, the number of suspects compared to the number of agents when the vehicle was initially stopped, the inherent danger involved in stopping a vehicle with occupants suspected of narcotics trafficking, and the agents lack of control over the situation

---

[31] The Court in *Trullo* acknowledged that "[w]hile the time of day and the reaction of appellant arguably might be said not to weigh in justification of displaying a gun, the other factors clearly support the officer's decision." 809 F.2d at 133. Thus, it is not dispositive that the stop of the Jeep, in this case, took place in the mid-morning and involved suspects who did not engage in evasive measures or furtive hand movements.

created a substantial risk to the agents' safety.[32] Accordingly, the circumstances were such that it was reasonable for the CBP agents to point their firearms at the Jeep and, then later, the suspects themselves, until the agents neutralized the potential danger and reestablished the status quo.[33]

Defendants implicitly contend that while the agents' use of guns, in isolation, may not amount to a de facto arrest, the drawing of weapons along with the additional intrusive conduct—namely the handcuffing and laying of the suspects on the ground—combined to elevate this stop into an arrest.[34]

However, the agents' subsequent conduct does not alter the outcome of the Court's decision today. While it is likely that the combination of highly intrusive conduct would have amounted to an arrest without additional justification,[35] the agents in this case found a gun immediately upon opening the door to the Jeep. At that point, the agents had more than a sufficient belief that the suspects were armed and dangerous as the danger of the firearm was immediately present. Thus, the additional safety precautions were warranted to ensure the suspects could not access any other potential weapons in the vehicle. *See Johnson*, 592 F.3d at 453 ("An officer with reasonable suspicion that the occupants of a vehicle are armed and dangerous does not act unreasonably by drawing his weapon, ordering the occupants out of the vehicle, and handcuffing them until the scene is secured." (citing *United States v. Hastamorir*, 881 F.2d 1551, 1557 (11th Cir. 1989))); *see also United States v. Tiru-Plaza*, 766

---

[32] Even if the reasonable suspicion may not be especially strong, the Third Circuit has held that "considerable deference" must be given to officers' "determinations of reasonable suspicion." *Mosley*, 454 F.3d at 252 (citing *United States v. Nelson*, 284 F.3d 472, 482 (3d Cir. 2002)).

[33] *Stiegel v. Peters Tp.*, 600 Fed. App'x 60, 67 (3d Cir. 2014) (concluding that the use of guns was reasonable, in part because the officer's "use of his service weapon was limited—he displayed it for a short amount of time and holstered it once the situation was under control.").

[34] As noted by the Third Circuit in *Baker*, the "use of guns and handcuffs must be justified by the circumstances" and therefore, the Court "must look at the intrusiveness of all aspects of the incident in the aggregate." 50 F.3d at 1193. Accordingly, the Court must consider whether the combination of intrusions here was appropriate at each stage of the seizure.

[35] Several circuits have found that if after conducting a *Terry* frisk, no weapons are found, it is inappropriate to continue using highly intrusive restraints such as guns and handcuffs. *See Haynes v. Minnehan*, 14 F.4th 830, 836 (8th Cir. 2021); *United States v. Bailey*, 743 F.3d 322, 340-41 (2d Cir. 2014).

*United States v. Borrome, et al.*
Case No. 3:22-cr-0001
Memorandum Opinion
Page 25 of 48

F.3d 111, 121 (1st Cir. 2014) (finding that because occupants of a vehicle "will often be engaged in a common enterprise," it is not unreasonable to suspect that other passengers are potentially armed upon the discovery of a firearm) (internal citations omitted). Therefore, although the occupants of the Jeep certainly suffered an unwelcomed and substantial intrusion once the agents drew their weapons, handcuffed the occupants and put them on the ground, the Court finds that such conduct was permitted under *Terry* given the clear need to take the additional precautions to ensure the agents' safety during the course of the investigation.[36] As such, neither firearm seized from the Jeep may be suppressed by virtue of the nature of the initial detention.

### 3. Seizure of the First Firearm

The defendants next argue that even if the CBP agents only needed reasonable suspicion to effectuate the initial stop, the agents still needed probable cause to conduct the "search" that led to the seizure of the first firearm. Therefore, since the agents did not have probable cause to search the vehicle when they seized the first firearm, the defendants argue that the first firearm must be suppressed.

The Government, of course, disagrees. Although during the evidentiary hearing, counsel for the Government was unable to articulate a coherent legal doctrine justifying the seizure of the first firearm,[37] the Government argued in its opposition brief that the seizure

---

[36] The Court also notes that the length of time the suspects were in handcuffs could elevate the *Terry* stop into an arrest, *see United States v. Sharpe*, 470 U.S. 675, 685 (1985); *United States v. Fiseku*, 915 F.3d 863 (2d Cir 2018), however, the two guns were seized within the first fifteen minutes of the stop. Therefore, even if the more than hour-long detention ultimately amounted to an arrest, the length of the detention would not justify suppression of the items seized at a time when the seizure was still a *Terry* stop. *See Grice v. McVeigh*, 873 F.3d 162 (2d Cir. 2017).

[37] At the evidentiary hearing on May 2, 2023, the Government argued that the agents were entitled to seize the first firearm by virtue of the fact that the CBP agents observed the gun in "plain sight" immediately upon opening the doors to the Jeep. Interestingly, the Government clarified that it was not justifying the seizure of the first firearm as part of a *Terry* frisk, a search incident to arrest, or even pursuant to the plain view doctrine. Instead, the Government argued that the gun was lawfully seized because of the general principle that officers are authorized to seize all guns on sight that they believe to be contraband. Once the Court pressed the Government to identify the legal doctrine that would justify the lawful seizure of the first firearm, the Government somewhat offhandedly mentioned the automobile exception as the basis for this first seizure. However, given the Government's seeming confusion on this issue, and its lack of genuine commitment to that argument, the Court will not find that the Government is relying on the automobile exception as the basis for the first seizure, and instead, rely on the Government's brief for the purposes of this memorandum opinion.

*United States v. Borrome, et al.*
Case No. 3:22-cr-0001
Memorandum Opinion
Page 26 of 48

was justified as part of a *Terry* frisk of the Jeep. (ECF No. 294.) Thus, to lawfully seize the firearm, the Government asserts that the agents merely needed reasonable suspicion that the occupants were in possession of firearms. *See id.* The Government maintains that the reasonable suspicion standard was satisfied here because, at the time of the stop, the agents reasonably believed they "were investigating a large drug trafficking crime." *Id.*

After a review of the record, the Court is satisfied that the seizure of the first firearm was the result of a lawful protective *Terry* frisk. The purpose of a frisk of a vehicle during an investigatory *Terry* stop is to "protect [the agents'] personal safety and to maintain the status quo during the course of the stop." *Hensley*, 469 U.S. at 235; *see Adams v. Williams*, 407 U.S. 143, 146 (1972) (explaining that protective frisks are intended to "allow the officer to pursue his investigation without fear of violence[.]"). Accordingly, given that "roadside encounters between [law enforcement] and suspects are especially hazardous," the Supreme Court has concluded that an officer may conduct a protective frisk for weapons in the areas of a vehicle immediately accessible to the suspect as long as the officer possesses a reasonable belief that the suspect is dangerous, and the suspect may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1050 (1983).

While in the context of a search incident to arrest, the defendants are correct that the Supreme Court has limited law enforcement's ability to search an automobile once the suspect may no longer access the vehicle, *see New York v. Belton*, 453 U.S. 454, 460 (1981),[38] the Court has not imposed the same limitations on protective frisks pursuant to an investigative *Terry* stop. In *Long*, the Supreme Court concluded that law enforcement may still conduct a protective frisk of a vehicle even after the suspect is under the officer's control and he or she can no longer gain immediate access to any weapons that may be inside the vehicle. *See* 463 U.S. at 1051. The justification for giving officers the additional discretion to

---

Accordingly, the Court concludes that the Government has raised an issue demonstrating that the defendant's constitutional rights were not violated by the seizure of the firearm.

[38] At the evidentiary hearing, Defendants argued that since they had already exited the vehicle and had been handcuffed when the agents seized the gun, the gun was no longer immediately accessible to the defendants and thus could not be lawfully seized.

conduct protective frisks in this context is that a suspect detained during the course of an investigative stop may "be permitted to reenter the vehicle before the *Terry* investigation is over, and [] may have access to weapons." *Id.* Moreover, even a suspect who is securely detained throughout the stop but is not ultimately arrested will eventually be able to reenter the automobile, at which point, he or she will have access to any weapons inside. Accordingly, additional precautions may be necessary during a *Terry* stop that are not present when the suspect has been arrested.

After considering the rationale behind the decision in *Long*, it is evident that the initial seizure of the first gun from the Jeep did not exceed the limits for a lawful *Terry* stop. As noted earlier, the CBP agents had a legitimate, reasonable suspicion that the occupants of the Jeep were armed and dangerous given the agents' reasonable suspicion that the suspects were involved in a large-scale drug trafficking scheme.[39] Thus, after the occupants of the Jeep were removed from the vehicle and quickly handcuffed, it was still reasonable under *Long* for the officers to conduct a protective frisk of the vehicle and seize the weapon the agents had seen earlier. Therefore, since the first firearm was seized as a part of a lawful *Terry* frisk of the Jeep, the firearm was obtained in accordance with the Fourth Amendment and will not be suppressed.

### 4. Seizure of the Second Firearm

The Jeep defendants also attempt to claim that the second firearm should be suppressed because the agents lacked the probable cause necessary to search the vehicle. Given that the defendants claim the second firearm was seized because of an unlawful search, the defendants seek to suppress the second firearm as a fruit of the poisonous tree.

Unlike the first firearm, the Government acknowledges that the CBP agents needed probable cause to conduct the search of the Jeep that ultimately led to the seizure of the

---

[39] Borrome Diaz attempts to argue that the frisk somehow exceeded the bounds of *Terry* and its progeny because the first gun was seized from the Jeep's driver's seatback side pocket—a place not immediately accessible to him as the driver. Thus, because the weapon was not immediately accessible to him, Diaz claims the frisk of that area of the Jeep was unlawful as to him. However, this argument is directly contradicted by the Third Circuit's opinion in *Davis*, which plainly states that officers may search "the passenger area of a vehicle" during a *Terry* frisk. 726 F.3d at 439. The place where the gun was found was clearly a part of the passenger area of the Jeep and thus fits squarely within Third Circuit precedent.

*United States v. Borrome, et al.*
Case No. 3:22-cr-0001
Memorandum Opinion
Page 28 of 48

second firearm. However, in this instance, the Government argues that the agents had probable cause by the time they began the full search of the Jeep.[40]

Although the Government acknowledges that the agents possessed mere reasonable suspicion that the Jeep was involved in a drug trafficking operation when the agents first initiated the stop, the Government contends their suspicion escalated to probable cause while conducting the *Terry* frisk of the vehicle.[41] As previously mentioned, during the frisk the agents seized the first gun, which the Government argues, further buttressed the agents' belief that this vehicle was involved in drug trafficking given that guns are a common tool of the drug trafficking trade. The agents also noticed that five of the occupants had wet sandy feet. Additionally, while conducting the frisk, the CBP agents on the ground were informed that the four jet skis were attempting to avoid interdiction by the CBP marine vessels. According to the Government, these three additional factors gave the agents probable cause that there would be contraband or other evidence of drug trafficking inside the Jeep.

Before addressing the merits of the parties' arguments, the Court must first determine which defendants, if any, have "standing"[42] to make a Fourth Amendment challenge to the search. While all the Jeep occupants seek to suppress any and all contraband unlawfully seized during the federal agents' search of the Jeep, only Rodriguez-Rodriguez

---

[40] Even if the law enforcement officers do not have probable cause to conduct a search or effectuate an arrest when they initiate a stop, "reasonable suspicion may 'ripen' or 'develop' into probable cause." *United States v. Scroggins*, 599 F.3d 433, 441 (5th Cir. 2010) (citations omitted).

[41] Although the agents referred to the search that uncovered the second gun as an "inventory search," the Government correctly avoids arguing that the search was permissible without probable cause pursuant to the inventory search exception. In order for a search to constitute an inventory search, the vehicle must have been lawfully impounded. *See United States v. Kimhong Thi Le*, 474 F.3d 511, 514 (8th Cir. 2007). By the time this search took place, there was no basis for the vehicle to be impounded. Therefore, the inventory exception does not apply here.

[42] The Court notes that the term "standing" is not intended to be understood in the traditional jurisdictional sense. Rather "[t]he 'standing' inquiry, in the Fourth Amendment context, is shorthand for the determination of whether a litigant's Fourth Amendment rights have been implicated." *Mosley*, 454 F.3d at 253 n. 5. (citing *United States v. Kimball*, 25 F.3d 1, 5 (1st Cir.1994)); *see also Byrd v. United States*, 138 S.Ct. 1518, 1530 (2018) (explaining that "[t]he concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search; but it should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits" (citing *Arizona Christian School Tuition Organization v. Winn*, 563 U.S. 125, 129 (2011))).

and Borrome Diaz have standing to contest the legality of the search given that the initial seizure of the Jeep was lawful. *See Mosley*, 454 F.3d at 253.[43]

To have "standing," an individual challenging a search must have had "a reasonable expectation of privacy in the property searched and the item seized." *United States v. Burnett*, 773 F.3d 122, 131 (3d Cir. 2014) (citing *Minnesota v. Olsen*, 495 U.S. 91, 95-97 (1990)). However, "Fourth Amendment rights are personal rights which like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969) (citations omitted). Therefore, the defendant making the challenge must, themselves, have an ownership or possessory interest in the vehicle in order to have a reasonable expectation of privacy in that vehicle. *See Rakas v. Illinois*, 439 U.S. 128, 148 (1978). While drivers in lawful control of a vehicle generally have a sufficient interest to establish standing, *see Byrd v. United States*, 138 S. Ct. 1518, 1531 (2018), passengers who do not own or lease the vehicle typically lack a sufficient possessory interest in that vehicle. *See United States v. Baker*, 221 F.3d 438, 441-42 (3d Cir. 2000). Consequently, those passengers do not have an expectation of privacy in the vehicle, and thus, have "no standing to challenge a search of [a] car" that has been lawfully stopped. *See id.* (citing *Rakas*, 439 U.S. at 133-34).[44] In this case, the only occupants who assert a legitimate possessory interest are Rodriguez-Rodriguez and Borrome Diaz. Borrome Diaz claims a possessory interest in the Jeep as the driver and Rodriguez-Rodriguez claims possessory interest by virtue of renting the Jeep. Because it is well recognized that both of these interests are sufficient to establish a reasonable expectation of privacy in a vehicle, Rodriguez-Rodriguez and Borrome Diaz

---

[43] As the Third Circuit explained in *Mosley*, while a passenger who does not have a reasonable expectation of privacy in the vehicle may challenge the constitutionality of an allegedly unlawful search of a vehicle, the passenger may only do so if the seizure itself is unlawful. 454 F.3d at 253. Where the stop is permissible, a subsequent search may not be challenged by someone who does not have a possessory interest in the vehicle. Thus, because the seizure of the defendants' Jeep was lawful, the passenger defendants may not challenge any alleged unlawful search unless the defendant can demonstrate he has a possessory interest in the Jeep.

[44] It is also irrelevant whether the defendant challenging the search owned the contraband seized. *See United States v. Salvucci*, 448 U.S. 83, 92 (1980) ("we simply decline to use possession of a seized good as a substitute for a factual finding that the owner of the good had a legitimate expectation of privacy in the area searched."); *Burnett*, 773 F.3d at 132 ("Even if [defendant] owned the stolen property…the Supreme Court has rejected the theory that a 'legitimate expectation of privacy' can rest on mere ownership of property.").

have standing to challenge the search of the Jeep.[45] Given that the remaining Jeep defendants are passengers who lack a possessory interest in the vehicle, they are barred from challenging the constitutionality of the agents' search of the lawfully seized Jeep at this juncture. Accordingly, the Court will now proceed to the merits of Borrome Diaz and Rodriguez-Rodriguez's unconstitutional search claims.

As with all searches, in order to avoid violating the Fourth Amendment, law enforcement must first obtain a warrant before conducting a search unless a clearly defined exception applies. *See Robertson*, 305 F.3d at 167. One major exception to the warrant requirement is the automobile exception. *See Carroll*, 267 U.S. at 153-54. Under the automobile exception, law enforcement officers may conduct a search of the entire vehicle as long as they possess probable cause to believe that the vehicle contains contraband or evidence of a crime. *See United States v. Ross*, 456 U.S. 798, 825 (1982),

While there is no direct evidence in this case linking the Jeep to the likely criminal activity on the beach, law enforcement may establish probable cause through the accumulation of circumstantial evidence alone. *See United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002); *United States v. Adams*, 971 F.3d 22, 32 (1st Cir. 2020) ("A showing of probable cause may be premised on either direct or circumstantial evidence or some combination of the two.") (citing *Gates*, 462 U.S. at 238). However, the circumstantial evidence must still be sufficient to create a "fair probability" or "substantial chance" that a search of the vehicle would turn up contraband or, in this instance, evidence of drug trafficking. *Gates*, 462 U.S. at 238; *United States v. Ingrao*, 897 F.2d 860, 862 (6th Cir. 1990) (citations omitted). Mere suspicion and speculation are insufficient to satisfy the standard for probable cause. *See Ingao*, 897 F.2d at 862. Accordingly, the Court is not convinced that the CBP agents had the probable cause necessary when they initiated the search of the Jeep.

Although the Court may have been satisfied that the probable cause requirements were met if there was a clear nexus between the suspects on the beach and the Jeep, there simply is not. *See United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017) (noting there

---

[45] *See United States v. Walker*, 237 F.3d 845 (7th Cir. 2001) (collecting cases showing that a renter has standing to challenge a search); *Baker*, 221 F.3d at 442-43 (finding that a driver with lawful control over a vehicle has a reasonable expectation of privacy in the vehicle sufficient to challenge a search of that vehicle).

must be a nexus between the evidence sought and the place to be searched); *Kraus v. Pierce County*, 793 F.2d 1105, 1109 (9th Cir. 1986) (holding that there was no probable cause where there was no "information linking them or their car to the crime scene."). No CBP agent ever saw the suspects on the beach enter or exit the Jeep, nor did the agents ever witness the suspicious duffel bags being removed from vehicle. Consequently, at the moment of the initial stop, there was not an obvious reason to believe narcotics, or other evidence of drug trafficking would be found in the vehicle or that the vehicle was being used to conduct narcotics transactions. *See United States v. Butler*, 93 F. Supp. 3d 392, 401 (W.D. Pa. 2015) (finding no probable cause because suspect was never actually seen entering the place where the suspected criminal activity was taking place—the officers just assumed that the suspect did so). *Cf. United States v. Lloyd*, No. CR 21-81, 2022 WL 2916684, at *5 (E.D. Pa. July 22, 2022) (concluding that an officer who witnessed a suspect engage in a drug transaction did not have probable cause to search the suspect's vehicle until the "officer saw Defendant unlock the Nissan Altima, open the trunk, and move items around"). This is especially true given the fact that the passing of the duffel bags on the beach appeared to be a one-way transaction. Therefore, because the jet ski operators already had the duffel bags by the time the agents stopped the Jeep, there was not a solid factual basis to believe the Jeep itself would still contain evidence of drug trafficking even if it was used to facilitate the duffel bag exchange.[46]

While the Court earlier found that the CBP agents' lack of confirmation as to whether the individual on the beach ever entered the jeep did not prevent the agents from initiating the stop on the Jeep, that was because the Court was reviewing the circumstances through the lens of reasonable suspicion. However, because the probable cause necessary to search a car is a more demanding standard, more persuasive evidence is required.[47] Unfortunately

---

[46] While there was not a fair probability the Jeep contained evidence of drug trafficking, there was at least reasonable suspicion to believe it would. Otherwise, there would not have been reasonable suspicion to believe the suspects were armed and dangerous.

[47] The Government acknowledged as much by conceding that the agents did not have probable cause when they initiated the felony stop of the Jeep.

for the Government, the additional evidence uncovered during the *Terry* frisk did not elevate the agents' suspicion of the Jeep from reasonable suspicion to probable cause.

In an effort to more clearly demonstrate that the beach suspects were the same people stopped in the red Jeep, the Government highlights the fact that the floorboard of the Jeep was wet and sandy as were the occupants' feet. Presumably, the Government suggests that because the Jeep occupants' feet were wet and sandy, and the five people loading the duffel bags at Mermaids Chair were the lone people on the beach at that time, the beach suspects must have been the same people who drove to the Botany Bay gate in the Jeep some twenty minutes later as they would have likely been some of the few people to still have wet feet.

However, wet and sandy feet are not indicative of criminal behavior, particularly around noon on a Saturday on an island surrounded by beaches. *Contrast United States v. Ballard*, 600 F.2d 1115, 1120 (5th Cir. 1979) (finding probable cause to believe the vehicle contained contraband in part because actions of the automobile occupants were atypical of tourists who visited the area). Certainly, it is noteworthy that there was no one else on Mermaids Chair Beach during the duffel bag exchange; however, the agents made no determination that the adjacent beaches were also empty. While it is true that the Jeep occupants' wet sandy feet created a decent probability that the suspects were recently at a beach, there was nothing about the information that made it any less likely that the suspects were coming from another nearby beach. For example, from where the Jeep was parked, Sandy Bay beach is equally accessible. While, of course, the agents did not have to be one hundred percent certain that the occupants came from the Mermaids Chair beach before searching the vehicle, *see United States v. Williams*, 627 F.3d, 247, 251 (7th Cir. 2010), the mere wetness of the occupants' feet is wanting.

Similarly, the fact that during the frisk of the Jeep, the jet skis operators reportedly were trying to evade interdiction fails to carry much weight in the Court's probable cause analysis. First, as has already been noted, there is an evidentiary disconnect between the beach suspects and the Jeep suspects. Thus, any suspicion of criminality on the part of the jet ski operators cannot necessarily be imparted onto the Jeep suspects given that, at that point,

there was not a fair probability that the jet ski operators and the Jeep suspects ever interacted. *See Ingrao*, 897 F.2d at 863 (finding that where officers had not observed suspects meet or interact with each other, the conduct of one suspect could not be imputed on the other).

Additionally, in contrast to the jet ski operators, the suspects in the Jeep did not make any furtive movements nor did they try to evade law enforcement. Instead, the Jeep suspects complied with every command immediately and without resistance. Therefore, the juxtaposition between the jet ski operators' conduct and the Jeep occupants' conduct arguably make it less likely that both groups were participating in the same criminal enterprise.

Moreover, the Government argues that the basis for searching the Jeep was that there was probable cause to believe the Jeep was involved in drug trafficking. However, during the initial pursuit of the jet skis, the agents were not sure what the duffel bags contained. While the agents suspected narcotics, the bags could just as easily have held money, stolen goods, or some other kind of contraband. *See Butler*, 93 F. Supp. 3d at 401 (finding no probable cause where suspect was holding a bag of unknown content near a place believed to be involved in suspected drug dealing); *Ingrao*, 897 F.2d at 864 ("[C]arrying a bag, while arguably contributing to probable cause, does not add significantly to any already existing suspicion by the police.") (citing *Ceballos*, 654 F.2d at 185). Thus, the evasive nature of the jet ski operators did not necessarily indicate that the transfer of the duffel bags on Mermaids Chair Beach was a drug trafficking exchange. Consequently, the Court is unpersuaded that this fact made it more likely that the CBP agents at the Botany Bay gate would be more likely to find evidence of drug trafficking in the Jeep.

The final piece of evidence the Government relies on to support its probable cause claim is the first firearm seized from the Jeep. However, mere possession of a gun is not illegal in the Virgin Islands. *See United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000) (citing 23 V.I.C § 470). Therefore, without more, there is nothing inherently criminal or suspicious about the presence of a gun in the Jeep. *See United States v. Brown*, 2023 WL 3300498, at *6 n. 6 (W.D. Pa. May 8, 2023) ("To be clear, possessing a gun, standing alone, isn't a basis to

search a car; after all, a person may have a permit to carry a weapon."). Consequently, the knowledge that a citizen is in possession of a gun is an insufficient basis to establish the reasonable suspicion necessary to even make a *Terry* stop. *See Ubiles*, 224 F.3d at 218. Yet, here, the Government attempts to convince the Court that the mere presence of a gun in a vehicle provided sufficient evidence to establish probable cause for drug trafficking.

Indeed, while the Court has already acknowledged that it may be reasonable to suspect that where there are large amounts of drugs, there are guns, *see supra* section b, but the inverse inference is not given equal credence. The Court is unaware, and the Government has not cited a single case in which the presence of a gun, in the absence of other drug paraphernalia established probable cause of drug trafficking. This is because it would be illogical to presume that the mere presence of a gun would somehow indicate someone was involved in criminal activity. If such were the case, then law enforcement would be able to drastically expand their ability to search a vehicle anytime a gun was present. While the Government seems to argue that the first gun merely corroborated and ultimately created a fair probability that the duffel bag exchange was in fact drug trafficking, even assuming that there were drugs in the bags, that evidence did not tend to create a suspicion that evidence of drug trafficking would be in the Jeep especially given that the suspects on the beach received nothing in return.

Thus, the first gun is doing a substantial amount of heavy lifting in the probable cause analysis. The government, in essence, argues that given the mere presence of a gun, the agents conducting the stop not only further established that the Jeep suspects were involved in the duffel bag exchange on the beach, but that those duffel bags were substantially likely to contain narcotics.

Consequently, after considering the totality of the circumstance that led to the search of the Jeep, the Court is unpersuaded that the agents possessed the probable cause necessary to search the Jeep. The evidence used to justify the search only takes on a sinister coloration upon the theory that the Jeep suspects were involved in the duffel bag exchange on the beach and that the duffel bags, in fact, contained evidence of drug trafficking. The proximity of the Jeep to the suspected crime, the timing of the Jeep's departure from the parking lot, the

occupants' wet sandy feet, the presence of a gun in the vehicle, all add up to, at most, mere suspicion of criminal activity. However, a search of a vehicle based on "mere suspicion collides violently with the basic human right of liberty" enshrined in the Fourth Amendment. *Henry v. United States*, 361 U.S. 98, 101 (1959); *Brinegar, United States*, 338 U.S. 160, 176 (1949) (stressing that the "long-prevailing [probable cause] standards seek to safeguard citizens from rash and unreasonable interreferences with privacy and from unfounded charges of crime."). Thus, in these circumstances, the Court finds that the second firearm was seized during the course of an unlawful search. As such, the second firearm must be suppressed from evidence.

## IV.  FIFTH AMENDMENT LEGAL STANDARDS

Under the Fifth Amendment of the Constitution, "no person…shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This is commonly known as the "privilege against self-incrimination." *Malloy v. Hogan*, 378 U.S. 1, 7 (1964).

### A.  *Miranda* Warning Requirements

To safeguard the Fifth Amendment privilege against compulsory self-incrimination prior to trial, the Supreme Court concluded in *Miranda v. Arizona* that the government may not introduce statements made by a criminal defendant during a "custodial interrogation," unless the defendant has first received his or her *Miranda* warnings. *See Berkemer v. McCarty*, 468 U.S. 420, 428 (1984); *United States. v. Mesa*, 638 F.2d 582 (3d Cir. 1980).

A "custodial interrogation" has been defined for *Miranda* purposes as a "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. To determine whether there has been a custodial interrogation, a court must conduct a two-part inquiry. *See Mesa*, 638 F.2d at 585. First, the court "must determine whether the suspect was in 'custody'" at the time the statements were made. *Mesa*, 638 F.3d at 585 (citing *Orozco v. Texas*, 394 U.S. 325 (1969)); *see also Stansbury v. California*, 511 U.S. 318, 322 (1994).[48]

---

[48] "An officer's obligation to administer *Miranda* warnings attaches, however, 'only where there has been such a restriction on a person's freedom as to render him in custody.'" *Stansbury*, 511 U.S. at 322 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)) (per curium) (citing *Illinois v. Perkins*, 496 U.S. 292, 296 (1990)).

And second, "[i]f the suspect was in 'custody,' the court then must decide whether [law enforcement officials] interrogated him." *Messa*, 638 F.2d at 585 (citing *Rhode Island v. Innis*, 446 U.S. 291 (1980)). "The presence of *both* a custodial setting and official interrogation is required to trigger *Miranda* warnings, and therefore, in the absence of one or the other, *Miranda* is not implicated." *Government of Virgin Islands v. Christopher*, 990 F. Supp. 391, 393-94 (D.V.I 1997) (citing *Miranda*, 384 U.S. at 477-78); *see also United States v. Dupree*, 617 F.3d 724, 731 n. 7 (3d Cir. 2010) ("The rule of *Miranda* applies if two requirements are met: a defendant must be (1) 'in custody' and (2) subject to 'interrogation' by the Government.") (citations omitted).

### 1. *Custody*

The first requirement—the custody requirement—is usually satisfied in "circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). In determining whether such circumstances exist, "the initial step is to ascertain whether, in light of 'the objective circumstances of the interrogation,'[ ] a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.'" *Howes*, 565 U.S. at 509 (quoting *Stansbury*, 511 U.S. at 322 and *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

However, simply because the Court is satisfied that the defendant objectively suffered a restraint of freedom as a result of the encounter does not end the custody portion of the inquiry. As Justice Alito explained in *Howes*, "[n]ot all restraints on freedom of movement amount to custody for the purposes of *Miranda*." 565 U.S. at 509; *see also Maryland v. Shatzer*, 559 U.S. 98, 112 (2010). As such, courts must ask an additional question—"whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509. Thus, the Court must also consider "[1] the location or physical surroundings of the interrogation; [2] the length of the interrogation; [3] whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and [4] whether the suspect voluntarily submitted to questioning." *United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006).

If the encounter with law enforcement ultimately amounts to the defendant being in custody, then the Court may proceed to step two of the custodial interrogation analysis.

### 2. Interrogation

The second component of the custodial interrogation inquiry asks whether there has been an interrogation. An interrogation is defined as any "express questioning or its functional equivalent." *Innis*, 446 U.S. at 299.[49] This rather broad definition includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* Nevertheless, not every statement obtained by the police after a defendant is in custody is necessarily a product of an interrogation. *See id.* If a defendant is taken into custody and makes an unprompted statement freely, voluntarily, and by his own volition, such a statement is not considered the product of an interrogation. *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990) ("Any statement given freely and voluntarily without any compelling influence is, of course, admissible in evidence." (quoting *Miranda*, 384 U.S. at 478)). Thus, only statements compelled by law enforcement officials give rise to an interrogation for the purposes of *Miranda*.

When both the custody and interrogation requirements have been satisfied, an individual has been subject to a custodial interrogation, and thus, any statements that come from the interrogation generally must be suppressed unless the individual has first been provided the prophylactic *Miranda* warnings.

### B. Border Exception to *Miranda*

Although a person subject to a custodial interrogation is almost always entitled to *Miranda* warnings, *see United States v. Walton*, 10 F.3d 1024, 1026 (3d Cir. 1993), "the strong governmental interest in controlling our borders" requires that "the rules surrounding *Miranda* at the border are more relaxed." *United States v. Molina-Gomez*, 781 F.3d 13, 22 (1st Cir. 2015) (quoting *United States v. Fernández–Ventura*, 132 F.3d 844, 846 (1st Cir. 1998))

---

[49] The Court in *Innis* discussed other types of interrogation techniques beyond express questioning such as the "use of line-ups," "reverse line-up[s]," and "psychological ploys, such as to 'posit' 'the guilt of the subject' to 'minimize the moral seriousness of the offense' and 'to cast blame on the victim or on society.'" 446 U.S. at 299 (quoting *Miranda*, 384 U.S. at 453, 450).

(citing *United States v. Kiam*, 432 F.3d 524, 529 (3d Cir. 2006)). Due to the less demanding *Miranda* protections in the border context, customs and border officials retain the authority "to ask questions of those entering the United States" and individuals seeking admittance must generally answer. *Kiam*, 432 F.3d at 529 (quoting *United States v. Gupta*, 183 F.3d 615 (7th Cir. 1999) ("A person seeking entry into the United States does not have a right to remain silent.")); *see also United v. St. Vallier*, 404 Fed. App'x 651, 656 (3d Cir. 2010) (applying *Kiam* to customs inspections as well).

Notwithstanding, the more relaxed *Miranda* requirements at the border, there is still a limit to the type of questions an agent may ask an individual seeking to enter the United States without the agent first having to provide the individual *Miranda* warnings. *See Kiam*, 432 F.3d at 530. According to the Third Circuit in *Kiam*, the prophylactic warnings must be issued "if the inspector's questions objectively cease to have bearing on the grounds for admissibility and instead *only* further a potential criminal prosecution[.]" *Id.* (emphasis added).[50] The *Kiam* rule, however, does not require that an agent give an individual *Miranda* warnings simply because the agent's questions may in some way relate to potential illegal conduct. *See St. Vallier*, 404 App'x at 657 (citing *Kiam*, 432 F.3d at 531). "'[M]ere overlap' between questions geared towards an assessment of the admissibility of an individual or his effects and questions bearing on a potential criminal prosecution" are insufficient to entitle the defendant to *Miranda* warnings. *United States v. Thomas-Okeke*, Crim No. 2018-cr-0008, 2019 WL 2344772, at *11 (D.V.I. June 3, 2019) (quoting *Kiam*, 432 F.3d at 530) (citing *St. Vallier*, 404 App'x at 657.). Instead, *Miranda* warnings are only required in the border context where the agent's questions are *exclusively* intended to further a potential criminal prosecution. *See St. Vallier*, 404 App'x at 657; *see also Molina-Gomez*, 781 F.3d at 24 (noting that while the questions about defendant's reasons for traveling were permissible without

---

[50] In other circuits, the test for whether *Miranda* warnings are required at the border is whether the agent's questions were routine or non-routine. *See e.g.*, *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996); *United States v. Ventura*, 85 F.3d 708, 711 (1st Cir. 1996). The *Kiam* court refused to adopt the routine/non-routine delineation as it concluded "that courts have gone to great pains to label almost all questioning 'routine.'" *See Kiam*, 432 F.3d at 529, 529 n. 4. In hope of creating a clearer and more objective standard, the Third Circuit adopted this new test wherein *Miranda* warnings are only required when the inspector's questions bear exclusively on a potential criminal prosecution. *See id.* at 530.

first issuing *Miranda* warnings, questions about the defendant involvement in drug activity were not because the "line of questioning had nothing to do with whether or not to admit [the defendant] into the country.").[51]

Given the impracticalities of stopping someone at the exact moment the individual crosses the border, the border questioning "exception applies not only at the physical borders of the United States, but also at the 'the functional equivalent' of a border." *United States v. Whitehead*, 541 F.3d 480, 485 (3d Cir. 2008) (citing *Almeida–Sanchez v. United States*, 413 U.S. 266, 272–73 (1973); *see also Kiam*, 432 F.3d at 529 (clarifying that the border-questioning exception applies equally to a physical border as the functional equivalent of a border—"the Philadelphia International Airport"). The functional equivalent of the border is generally understood to be "the first point at which an entrant may practically be detained." *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993) (citing *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973)). For example, "the airport where an international flight lands," or "the first port where a ship docks after arriving from a foreign country."[52] *Cardenas*, 9 F.3d at 1147; *Whitehead*, 541 F.3d at 4; *see also United States v. Reyes*, Crim No. 92-337, 1993 WL 151880, at *4 (D.P.R. Apr. 23, 1993) (noting that "[p]orts of entry, like the marina, have been found to be the functional equivalents of a border."). Thus, under this border doctrine, as long as the individual is stopped in a location that amounts to the functional equivalent of a border, a customs or immigration agent retains the same authority to question the individual as they would at the physical border. Accordingly, an agent interrogating an individual at the functional equivalent of the border may inquire into the admissibility of the individual or his effects absent any particularized suspicion. *See Kiam*, 432 F.3d at 530-31; *St. Vallier*, 404 Fed. App'x at 656.

### V. FIFTH AMENDMENT ANALYSIS

---

[51] The Court notes that determining whether *Miranda* warnings are required in this context is an objective inquiry. *See Kiam*, 432 F.3d at 530; *Thomas-Okeke*, 2019 WL 2344772, at *13 ([T]he test outlined in *Kiam* and *St. Vallier* calls for an *objective* inquiry[.]"). Thus, it is of no significance that the agent may subjectively suspect the individual is engaged in criminal conduct as long as the questioning could be objectively view as necessary for determining whether the individual and his effects could enter the country.

[52] However, if the person is stopped for questioning after the first point practicable, the stop is no longer routine and, thus, the agent must have at least reasonable suspicion before stopping and questioning the individual. *See United States v. Caminos*, 770 F.2d 361, 364 (3d Cir. 1985).

### A. Defendant was not entitled to *Miranda* Warnings Prior to the Statements in Question under *Kiam*

To determine whether Carrasquillo Santos was entitled to *Miranda* warnings prior to making the statements in question, the Court will begin by first deciding whether the *Kiam* border exception applies in this case. As noted above, for the *Kiam* standard to apply, the encounter must have occurred at the border or its functional equivalent. *See Kiam*, 432 F.3d at 529. The Court finds that Carrasquillo Santos was questioned at the functional equivalent of the border. Although the border is commonly understood as the international border, the Third Circuit has determined that the border exception to the Fourth and Fifth Amendment also applies to the Virgin Island's customs border regardless of the direction of the crossing. *See United States v. Forde*, No. 19-3654, 2022 WL 1772990, at \*1 (3d Cir. June 1, 2022) (citing *United States v. Baxter*, 951 F.3d 128, 134 (3d Cir. 2020); *Thomas-Okeke*, 2019 WL 2344772, at 6-7.

Because the Virgin Islands' customs zone constitutes a border, for Agent Garcia's stop to constitute a legitimate border search at the functional equivalent of the border, Agent Garcia must have had reasonable certainty that Carrasquillo Santos crossed the customs border, and the encounter must have taken place at the first practical opportunity after crossing the border. *See Cardenas*, 9 F.3d at 1147; *United States v. Guzman-Padilla*, 573 F.3d 865, 878 (9th Cir. 2009); *United States v. Helms*, 703 F.2d 759, 762-64 (4th Cir. 1983).

In this instance, Officer Garcia had circumstantial evidence that Carrasquillo Santo's jet ski had crossed the Virgin Islands' custom border before returning to Puerto Rico because he had received information from his fellow CBP agents that the AMO team had identified a similar looking jet ski traveling from Puerto Rico to St. Thomas which then headed back to Puerto Rico that same day. Additionally, Carrasquillo Santos was known to CBP agents from a previous encounter. Therefore, Agent Garcia had reasonable certainty to conclude that Carrasquillo Santos had crossed a border for the purposes of the border exception. *See United States v. Chabo*, 531 F. Supp. 1063, 1068-69 (D.V.I. 1982) (noting "that the Territory of the U.S. Virgin Islands is a 'customs zone' separate and apart from the United States, Puerto Rico, and other U.S. possessions"). Consequently, since Carrasquillo Santo's initial encounter with

the CBP agent took place at the first practical place for such a stop—the Las Croabas loading ramp[53]—the border search exception applied, and thus, Agent Garcia was permitted to conduct routine questioning regarding Carrasquillo Santos' admissibility. *See Kiam*, 432 F.3d at 529; *United States v. Linarez-Delgado*, 259 Fed. App'x 506, 509 (3d Cir. 2007) ("Linarez–Delgado freely presented himself in the territory of the United States when he attempted to enter Puerto Rico and, therefore, was subject to routine border questioning.").

Since the Court finds that Agent Garcia's questioning took place at the functional equivalent of the border, the Court must now turn to whether agent Garcia's questioning ever ceased to bear on Carrasquillo Santos' admissibility "and instead only further[ed] a potential criminal prosecution." *Kiam*, 432 F.3d at 530. The Court finds that Agent Garcia's questioning at all times remained relevant to the defendant's admissibility.

During his conversation with the defendant, Agent Garcia limited his questions exclusively to where Carrasquillo Santos was coming from and what was the purpose of his most recent trip. The only specific question Garcia asked Carrasquillo Santos was whether he had traveled to St. Thomas during his excursion that day. Certainly, Garcia's questions had at least some bearing on the defendant's admissibility so as not to violate the standard set out in *Kiam*. In order to determine the admissibility of a person, at a minimum, the agent must determine where the person seeking entry traveled and where he had come from. *See United States v. FNU LNU*, 261 F.R.D. 1, 3 (E.D.N.Y. 2009) ("An appropriate border crossing inquiry includes questioning the person seeking entry about her personal background and the purpose and nature of her trip."). Based on the record, it appears that Carrasquillo Santos did not provide sufficient information about where he had recently traveled, and as such, Agent Garcia was permitted to continue questioning the defendant about his recent whereabouts and the nature of his excursion before he determined that the defendant could be admitted into the territory.

---

[53] Given that other courts have routinely found docks and their surrounding area to constitute the functional equivalent of the border, *see United States v. Saint Prix*, 672 F.2d 1077, 1083 (2d Cir. 1982) (collecting cases), the Court finds no problem concluding that the loading ramp constituted the functional equivalent of the border here where the loading ramp was the first reasonable instance a stop could have been initiated after the defendant had crossed back over the Virgin Islands customs zone.

Despite the nature of Agent Garcia's questions, Carrasquillo Santos nevertheless tries to argue that the questions did not bear on his admissibility but rather were solely for the purpose of furthering a future prosecution. Carrasquillo Santos contends that Agent Garcia already knew the answers to the questions asked, and therefore no objective person would conclude that Garcia was looking to determine the defendant's admissibility. Consequently, Agent Garcia's questions necessarily must have been for the sole purpose of furthering a future prosecution.

Carrasquillo Santos conflates the objective and the subjective standard here. As the Third Circuit has explained, the need to mirandize an individual does not arise simply because the customs official subjectively believes the person being questioned is engaged in criminal conduct. *see Kiam*, 432 F.3d at 530, n. 6 ("The mere overlap of the admissibility questioning with the elements of [the defendant's] criminal liability is not fatal."). However, Agent Garcia's subjective beliefs and intent is exactly what Carrasquillo Santos focuses on to argue that Garcia's questions were intended exclusively for the purposes of a future prosecution. Carrasquillo Santos seems to insist that because Agent Garcia possessed circumstantial evidence regarding the defendant's travels, any question about the defendant's whereabouts and the nature of the trip no longer would inform the issue of admissibility. The defendant's conclusion, however, is mistaken. Agent Garcia had not yet confirmed that Carrasquillo Santos was, in fact, one of the individuals the AMO aircraft identified crossing over to St. Thomas on a jet ski. Although Agent Garcia may have had sufficient evidence to conclude with reasonable certainty that Carrasquillo Santos was one of those four individuals previously identified by the CBP Air and Marine Unit, the Court cannot go as far as to say it was unreasonable for Agent Garcia to clarify with Carrasquillo Santos where he had traveled on the jet ski for the purposes of admissibility.[54] If Carrasquillo

---

[54] Indeed, in *St. Vallier*, the Third Circuit specifically highlighted the situation where "an officer may suspect that an individual or that individual's effects must be interdicted because of a presently occurring effort or ongoing conspiracy to smuggle drugs across the international border." 404 Fed. App'x at 657. In that context, the Court said that the customs agent was permitted to ask questions about the person's travels plans, motives for traveling, and associations with other individuals during travel because although they were certainly likely to help further a future prosecution, they would also help establish basic facts relevant to an admissibility determination. *See id.* The Court when on to note that such questions were particularly appropriate where there had neither been a discovery of contraband nor an admission of criminal conduct. *See id.* at 657-58. Seeing as

Santos' explanation sufficiently demonstrated that he had not traveled in international waters or crossed over the Virgin Islands customs border, that would have certainly helped resolve the question of admissibility as well as the question of Carrasquillo Santos' criminal liability. Simply because his answers to questions regarding admissibility also turned out to implicate the defendant criminally is not sufficient to conclude that the questioning here violated the standard set out in *Kiam*. Accordingly, the Court finds that Agent Garcia's questions never ceased to bear on the question of admissibility. Therefore, under *Kiam*, Carrasquillo Santos was not entitled to *Miranda* warnings before Agent Garcia's questioning commenced.

### B. Carrasquillo Santos Was Not Entitled to *Miranda* Warnings Because There was No Custodial Interrogation

Even if Agent Garcia's questions exceeded the standard set out in *Kiam*, Carrasquillo Santos still was not entitled to *Miranda* warnings before being questioned because the encounter did not amount to a custodial interrogation. The mere fact that Carrasquillo Santos was being questioned by law enforcement officers is not in itself sufficient to establish he was in custody given that law enforcement "officers are not required to administer Miranda warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977); *see also Berkemer*, 468 U.S. at 437 (finding "a single police officer ask[ing] respondent a modest number of questions . . . at a location visible to passing motorists" did constitute custody for Miranda purposes).[55] Furthermore, when considering the relevant Third Circuit factors, the Court also finds that the circumstances are not consistent with a custodial encounter.

---

the questions and circumstances articulated in *St. Vallier* fall in line with the facts and circumstances in this case, the Court is convinced the questions Agent Garcia asked were appropriate.

[55] Moreover, as the Court noted in *California v. Beheler*, a law enforcement officer requesting to ask an individual questions shortly after a crime does not necessarily constitute custody either. *See* 463 U.S. 1121, 1123-25 (1983). Nor is it dispositive that the person being questioned is a suspect in the case, particularly when the officer's suspicion is undisclosed. *See Stansbury*, 511 U.S. at 325-26; *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Mathiason*, 429 U.S. at 495. Thus, the custody standard requires more than mere questioning. The movant must be deprived of freedom in some significant way. *Id.*

First, the record fails to show that an objective person would believe the defendant was under arrest or not free to leave. *See United States v. Harder*, 180 F. Supp. 3d 355, 363 (E.D. Pa. 2016) (concluding defendant was not in custody where "[n]o one told [d]efendant that he was under arrest or that he was not free to leave."). An officer never told Carrasquillo Santos that he was not free to leave or that he was required to answer the agent's questions. Instead, the defendant was asked whether he would be willing to answer a few questions to which the defendant agreed. Agent Garcia's request certainly helped convey the "volitional nature of the encounter." *United States v. Benjamin*, Crim No. 2017-0010, 2018 WL 6840150, at *9 (D.V.I. Dec. 30, 2018). And although Agent Garcia testified that he subjectively believed that Carrasquillo Santos was in custody during the questioning, the agent's subjective perception is not relevant for the purposes of the custodial analysis. An officer's subjective belief that a suspect was guilty of a crime or not free to leave is only relevant to the extent those beliefs were conveyed to the suspect or such belief affected the officer's "manner of approach or [] the tone or extent of their questioning." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999); *see Stansbury*, 511 U.S. at 325 ("An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned."). However, there is no indication in this record that Carrasquillo Santos was aware of Agent Garcia's belief or that Agent Garcia or any other officer's words or conduct was more intense, hostile, or otherwise intimidating because of Agent Garcia's belief.

Instead, the record indicates Agent Garcia's questioning was brief and nonhostile. Additionally, there was no physical restraint involved, nor did Agent Garcia make any showing of authority toward Carrasquillo Santos. There is no evidence in the record that Garcia showed his weapon or verbally intimidated Carrasquillo Santos. In fact, one of the only factors pointing toward custody, in this case, is that Agent Garcia showed Carrasquillo Santos the photograph of the individual on the black and purple jet ski. While the Third Circuit has stated that similar "interrogation tactics" may indicate the defendant was in custody during the interrogation, this factor alone is hardly sufficient to overcome the combination of other factors pointing to the contrary.

Furthermore, the environment itself could not be considered akin to the coercive conditions of a patrol station. The Defendant was asked questions on an open-air dock around other civilians as opposed to a small, isolated setting free from "impartial observers to guard against intimidation and trickery." *Miranda*, 384 U.S. at 461; *see Berkemer*, 468 U.S. at 437 (noting that the public nature of a stop creates a "substantially less 'police dominated' [environment] than that surrounding the kinds of interrogations at issue in Miranda itself"). Moreover, the questions were asked by one agent in the middle of the day. Thus, a reasonable person would not believe they were in a coercive environment during the encounter with Agent Garcia.

Consequently, given the nature of Agent Garcia's request to ask questions, the location of the encounter, and the brief nature of the interaction, the Court finds that Carrasquillo Santos was not in custody for Fourth Amendment purposes. Because Carrasquillo Santos was not in custody during his encounter with Agent Garcia, he was not subject to a custodial interrogation when he made the incriminating statements he now seeks to suppress. As such, Carrasquillo Santos was not entitled to *Miranda* warnings prior to Agent Garcia's line of questioning.

### C.  Carrasquillo Santos' Incriminating Statements Were Voluntary.

In addition to his *Miranda* argument, Carrasquillo Santos also maintains that his statements were not voluntary. Carrasquillo Santos contends that because he was confronted by uniformed officers immediately upon arriving in the Las Croabas area, he was given the impression that he had "no choice but to comply and answer questions." Given the totality of the circumstances, he argues that there is not sufficient evidence that his statements were produced by his "rational intellect and free will."

The Government disagrees that the statements were involuntary. The Government argues that "Garcia's brief questions regarding Defendant's whereabouts while at a border were not overbearing behavior breaking Defendant's will to resist." Additionally, the Government contends that there is no evidence to support any claims that Carrasquillo Santos' maturity, education, physical condition, or mental health inhibited his ability to make an unconstrained and rationally intelligent choice.

Irrespective of a valid issuance of *Miranda* warning or waiver, under the Fifth Amendment, "[s]tatements made to a law enforcement officer are inadmissible into evidence if the statements are 'involuntary'" *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) and *Colorado v. Connelly*, 479 U.S. 157, 165, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)). For a court to be satisfied that a statement was voluntary, the statement must be (1) "'the product of an essentially free and unconstrained choice by its maker;'" (2) "'the product of a rational intellect and free will;'" and (3) the defendant's will must not have been "'overborne.'" *United States ex rel. Hayward v. Johnson*, 508 F.2d 322, 326 (3d Cir. 1975) (citations omitted). In making a voluntariness determination, the Court must consider the totality of the circumstances.

Potential circumstances affecting the voluntariness of statements may include: (1) the length and location of the interrogation; (2) its continuity; (3) the defendant's maturity, level of education, physical condition, mental health; and (4) whether *Miranda* warnings were given. *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994). "[T]he crucial element" of the voluntariness inquiry, however, is "police coercion." *Withrow v. Williams*, 507 U.S. 680, 693 (1993); *see also Jacobs*, 431 F.3d at 108 ("A necessary predicate to a finding of involuntariness is coercive police activity.") (citation omitted). Regardless of the other potential factors, "[u]nless there is 'police conduct causally related to the confession,' a confession is considered voluntary. Thus, a court will not hold that a confession was involuntary unless it finds that it was the product of 'police overreaching.'" *Swint*, 15 F.3d at 289 (internal citations omitted) (quoting *Colorado v. Connelly*, 479 U.S. 157, 164 (1986); *see also United States v. Flemmi*, 225 F.3d 78, 91 (1st Cir. 2000) ("[T]he Supreme Court has confined the voluntariness concept by holding that only statements procured by coercive official tactics should be excluded as involuntary." (original alterations and internal quotation marks omitted)).

After considering the totality of the circumstances, the Court agrees with the Government that the defendant's statements were voluntary. Carrasquillo Santos made the incriminating statements of his own free will and without coercion. As noted in the previous

discussion, Agent Garcia asked Carrasquillo Santos if he would be willing to answer some questions, to which Carrasquillo Santos voluntarily agreed. Garcia asked the defendant routine questions about where he was that day and how far he had traveled. There is nothing about the questions which indicate they were coercive in nature.[56] In fact, Carrasquillo Santos most incriminating statement was made entirely unprompted.[57] Thus, in light of this record, the Court finds that the encounter lacked one of the key features necessary to make the encounter involuntary—police overreach. *See Withrow v. Williams*, 507 U.S. 680, 693 (1993); *Jacobs*, 431 F.3d at 108.

Additionally, Carrasquillo Santos provides no evidence to suggest that his maturity, level of education, physical condition, or mental health would make this encounter uniquely more coercive for him or would prevent him from making an intelligent, rational, and voluntary statement. Thus, given that Carrasquillo Santos' incriminating statements derived from a single brief encounter with an officer who asked him routine questions about his whereabouts, the Court finds that Carrasquillo Santos' statements were voluntary.

Accordingly, the statements at issue here were not obtained in violation of Carrasquillo Santos' Fifth Amendment rights and therefore will not be suppressed.

## VI.    CONCLUSION

After thorough review and consideration of the record, the motions, and the parties' oral arguments, the Court finds that the Customs and Border Patrol agents had sufficiently reasonable suspicion to stop the red Jeep Wrangler, forcibly detain the occupants, and seize

---

[56] Although Carrasquillo Santos contends that the immediate confrontation by CBP agents upon his arrival created the impression that he was required to answer each of the questions, his subjective impression is not determinative of whether the encounter was coercive. *See United States v. Benjamin*, No. CR 2017-0010, 2018 WL 6840150, at *11 (D.V.I. Dec. 30, 2018). The Court must consider objectively how someone would react to such an encounter.

[57] When Carrasquillo Santos said "Yes, that's me. But that was in Culebra. I never—I wasn't in St. Thomas," that statement was completely unprovoked by the officers. No agent asked the defendant a question or even showed him the photograph the statement was addressing. The defendant saw the photograph on Agent Garcia's phone while Agent Garcia was reviewing it. The defendant then immediately volunteered the incriminating statement without being questioned about the photograph. Therefore, at the very least, this specific statement should not be suppressed. *See United States v. Forde*, No. 19-3654, 2022 WL 1772990, at *3 (3d Cir. June 1, 2022) (concluding that defendant's spontaneous utterance of "that's weed" after the agents opened his suitcase constituted a voluntary statement); *United States v. Daniels*, Crim. Act. No. 09-569-01, 2010 WL 2163844, at *2-3 (E.D. Pa. 2010) (quoting *United States v. Fioravanti*, 412 F.2d 407, 413-14 (3d Cir. 1969)).

the first gun as a part of a lawful *Terry* stop and frisk. However, because the second gun was not seized pursuant to a warrant or another enumerated exception to the warrant requirement, the Court finds that the second gun seized was obtained as a byproduct of an unlawful search. Therefore, the second gun shall be suppressed as to the defendants who possess standing to challenge the constitutionality of the unlawful search.

As for Defendant Carrasquillo Santos' request to suppress his statements to agent Garcia on the Las Croabas dock, that motion is denied as well. Carrasquillo Santos was not entitled to *Miranda* warnings prior to providing his statements because his statements were made at the functional equivalent of the border and because he was not in custody. Additionally, the Court finds his statements were knowing, voluntary, and intelligent. There is no evidence to suggest that the brief routine conversation with Agent Garcia was in any way coercive or that Carrasquillo Santos had any mental, educational, or maturity issues that would preclude him from being able to make an intelligent and voluntary statement. Accordingly, the Court concludes that there is no basis for suppression of Carrasquillo Santos' statements under *Miranda* or the 5th Amendment.

An appropriate Order follows.

**Dated:** May 6, 2024                              /s/ *Robert A. Molloy*
                                                                 **ROBERT A. MOLLOY**
                                                                 **Chief Judge**